# EXHIBIT B

to

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

*CHRISTOPHER GRAVELINE, et al. v. RUTH JOHNSON, Secretary of State of Michigan, et al.*

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CHRISTOPHER GRAVELINE, et al.,

      Plaintiffs,

v.

RUTH JOHNSON, et al.,

      Defendants.

_____/

## DECLARATION OF CHRISTOPHER GRAVELINE IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**(Pursuant to 28 U.S.C. § 1746)**

I, Christopher Graveline, hereby declare under oath and subject to the penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am currently seeking the office of Michigan Attorney General as a no party affiliation (Independent) candidate in the upcoming November 6, 2018 election.

2. I began to consider this Independent candidacy after the Democrats' early endorsement convention on April 15, 2018. At that time, I was employed as an Assistant United States Attorney – Eastern District of Michigan and had been so employed since February 1, 2009.

3. Prior to that endorsement convention, I had read some newspaper

coverage about the race within the Democratic Party for the Attorney General nomination and I knew their nominees to be Ms. Dana Nessel, Mr. William Noakes, and Mr. Patrick Miles.[1] I had not studied their various stances on how they would carry out the duties of Attorney General, but I understood them to represent the wide spectrum of political views in the Democratic Party from progressive to centrist. After Ms. Nessel received the party's endorsement at its April 15 "endorsement convention," I began to read her views on how she intended to run the Attorney General's office. Ms. Nessel articulated how she would enthusiastically use the office of Attorney General to sue the federal government on a regular and routine basis. Over the last eight years, I have watched our current Michigan Attorney General, Mr. William Schuette, use this office in a partisan manner often suing the administration of President Barak Obama on a routine basis. I have strongly disagreed with that approach by Mr. Schuette and I strongly disagree with that approach being used by the Democratic candidate Ms. Nessel. I was also troubled by the tone and content of certain of political advertisements utilized by Ms. Nessel, which struck me as divisive and needlessly crass. Thus, it became clear to me that the Democratic Party would be

---

[1] The Democratic Party decided to hold an early "endorsement" convention on April 15, 2018 to informally choose candidates for Attorney General and Secretary of State to allow those candidates to better organize and fundraise. Both the Democratic and Republican parties will formally nominate their Attorney General candidates on August 25, 2018 at their respective state conventions. The Michigan statute in question requires the major parties to hold their nominating conventions by no later than September 7.

nominating a candidate who did not represent my political views.

4. I then began to look at the Republican Party announced candidates for Attorney General, current Speaker of the House Mr. Thomas Leonard and current State Senator Ms. Tonya Schuitmaker. The Republicans will not choose their candidate until August 25, 2018 nominating convention, so it is difficult to ascertain exactly who their candidate will be. However, both candidates are from a state legislature, which has been marked with partisan political rancor and neither seems to be campaigning as a centrist or opposed to the manner in which Mr. Schuette has been utilizing the office.

5. I believe that the Michigan Attorney General office should be non-partisan, and not used to advance either political agenda. The Attorney General is there to enforce the law, not make it or slant it to appease a political base. The Attorney General should concentrate on making the lives of citizens better by prompt and judicious enforcement of the law in order to address societal concerns such as violent crime, opioid trafficking, identity theft, and consumer protection. The Attorney General should act when the rights of any of its citizens are being infringed upon; but the Attorney General should not constantly be looking for the next opportunity to sue its political opponents or use the office to advance their party's political agenda.

6. I am an experienced attorney and prosecutor who began my career

serving in the U.S. Army Judge Advocate General's Corps, where I prosecuted the individuals involved in the Abu Ghraib prisoner abuse scandal. After my service in the Army was complete, I worked as an Assistant Wayne County Prosecutor, a human rights prosecutor in the U.S. Department of Justice, and finally as an Assistant United States Attorney – Eastern District of Michigan from February 1, 2009 to June 1, 2018. Over the past four years, I have been the Chief of the Violent and Organized Crime Unit for the U.S. Attorney's Office headquartered in Detroit, Michigan. Given my political views and that my professional career has been entirely dedicated to public service, I decided to resign my federal position and campaign as a no party affiliation candidate (political moderate) for that office as the candidates for the respective parties and issues began to crystallize for the upcoming election of Michigan Attorney General. I took these steps after careful consideration since I am a career public servant and family man, I am not independently wealthy.

7. I only entered this race when it became reasonably clear to me that the Democratic and Republican Parties would be nominating candidates who do not subscribe to these ideals.

8. As I began to seriously consider this run in early May, I was still a federal employee, and the Hatch Act precluded me from becoming a candidate for what is considered a partisan office including raising or spending any money to advance the campaign. Consequently, I took a few weeks to speak with potential supporters about

the viability of such a campaign and decided to leave federal service as of Friday, June 1, 2018 to pursue this candidacy. Among my early supporters was former United States Attorney Barbara McQuade, who formally endorsed my candidacy.

9. I filed a Statement of Organization beginning the campaign as of Monday, June 4, 2018. The following day, June 5, I obtained three copies of the nominating petitions from the Oakland County Bureau of Elections and began copying and distributing the forms to volunteers immediately. Obtaining the requisite number of copies of the nominating petitions cost the campaign approximately $670. An initial review of the petitions show that our petition drive commenced almost immediately after I declared my candidacy: the earliest signatures were collected on June 7, 2018, just three days after my campaign launched.

10. Under Michigan law, an independent candidate has a 180-day window in which to collect 30,000 valid signatures. That window closes on the 110th day before the general election or July 19, 2018. Consequently, the window for collecting signatures opened for independents on January 19, 2018. However, this 180-day window is only beneficial for independent candidates who are intent on running regardless of who the major parties put up as candidates. For someone in my position, who decided to run based on my dissatisfaction with the presumptive Democratic nominee, the petitioning period is much shorter. Ms. Nessel secured the Democratic Party's endorsement on April 15, or 86 days into the 180-day window,

leaving me only 94 days in which to raise 30,000 signatures – assuming I started the day after the convention.

11. In total, our campaign was able to recruit 231 volunteers to collect signatures on behalf of the campaign. The vast majority of these volunteers work full-time jobs or are parents with minor children, and collected in their free time on evenings or weekends. Collection efforts were conducted at family events, farmers markets, Fourth of July parades, street corners, and art fairs, as well as door-to-door operations. Between June 7 through July 19, 2018, 231 volunteers collected approximately 7,899 signatures.

12. Several attempts to circulate petitions at major fireworks gatherings were hampered by law enforcement officials. For example, Detroit Police officers refused to allow volunteer signature gatherers into Hart Plaza, a public space, prior to the Detroit fireworks on June 25, 2018. Likewise, officials in Bay City informed a campaign representative that petition circulators would not be allowed to collect signatures in the two main city parks, Veterans and Wenonah Parks, during the fireworks in that city. These interventions by state officials, in apparent violation of our petition circulators' First Amendment rights, substantially harmed the progress of our petition drive. Not only were we prevented from collecting signatures at some of the most productive events and locations available during the petitioning period, but also, petitioners who were prevented from collecting signatures often lacked a suitable

back-up location, meaning that they were deprived of any opportunity to collect signatures that day. Given the shortness of the petitioning period, the loss of these days was a harm we could not afford.

13. To supplement the volunteer efforts, I reached out to a signature-gathering firm, SMI Enterprises. SMI agreed to collect 5,000 billable signatures at a rate of $6 per billable signature collected. A billable signature is defined as a signature that is collected, processed, and reviewed for any apparent defects. The firm then guarantees that at least 75% of the billable signatures will be considered valid. The firm collected over 6,000 billable signatures at an expense to the campaign of $37,258. Hiring the firm to collect all 30,000 signatures, while taking into account a guarantee rate of 75%, would have cost the campaign approximately $225,000.

14. Being an independent campaign, our budget and fundraising is not based on large corporate donations, but rather on donations from individuals. While we were able to raise over $30,000 in just over three weeks, it would have been a practical impossibility to raise $225,000 to pay for all of these signatures.

15. In total, the campaign was able to collect approximately 14,157 signatures in 42 days for submission to the Bureau of Elections by July 19, 2018. The approximate monetary cost of the signature drive to the campaign was $38,000 and over 1,000 volunteer manpower hours.

16. I attempted to file the statutorily required two copies of notarized

Affidavits of Identity and the qualifying petitions at the Bureau of Election offices in Lansing. The Bureau of Elections refused to accept any of the filings since they did not consider it a "complete filing."

17. The current Michigan electoral scheme for independent candidates makes it a virtual impossibility for an independent candidate, who becomes motivated to run based upon the nominees of the respective parties to obtain ballot access. First, by law, neither major political party has to select their nominee for Attorney General until September 7, seven weeks after the deadline for independent filings. This year, that late nominating deadline was somewhat mitigated by the Democrats holding an early "endorsement" convention; but, even that convention was 86 days into the 180-window allotted to independents. By coupling a late nominating deadline for the major parties with an early deadline for independent filing, and combining that with a high signature requirement, Michigan has created an electoral structure that precludes independent candidates and insulates the major political parties from challenge.

18. My campaign made diligent and reasonable attempts to comply with the signature requirement currently in place. However, these requirements seem to only allow for a wealthy candidate who can pour his/her own fortune into hiring a signature collection firm or independent candidates who are determined to run at the beginning of the election cycle regardless of who the party candidates are. These

same requirements unreasonably burden an independent in my position: a non-wealthy candidate who is motivated to run only after the major parties' selections are nominated. The electoral scheme has served to injure my ability to obtain a place on the November 2018 ballot. Moreover, the only remedy at this point of the electoral cycle is to be placed on the ballot. Additional time to collect signatures, especially if the level remains at the elevated 30,000 valid signatures, would only serve to be a drain on both human and financial resources that should be spent on the actual campaign. Additionally, my ability to fundraise is hampered every day that there is a question of whether I will appear on the ballot. Candidate viability, especially for an independent candidate, is always an important issue and the perception that I will not appear on the ballot injures fundraising capacity and endorsements. Simply put, the combined effect of the high signature requirement, short petitioning period, and early filing deadline has made qualifying for the ballot for any statewide office unconstitutionality burdensome, laborious, and expensive.

Executed: July 26, 2018

*Christopher Graveline*