UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER GRAVELINE, et al.,

       Plaintiffs,

v.                              Case No. 18-12354
                                    Honorable Victoria A. Roberts

RUTH JOHNSON, et al.,

       Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION [ECF No. 4]

### I.    INTRODUCTION

In this ballot access case, Christopher Graveline ("Graveline") and three of his

supporters ("Plaintiff-Voters"; collectively "Plaintiffs") challenge three Michigan statutes

which they say operate in combination to deprive them of substantial associational and

equal protection rights under the First and Fourteenth Amendments to the United States

Constitution.

First, Plaintiffs say these statutes severely burden Graveline's right to appear on

the November general election ballot as an independent, non-partisan candidate for

attorney general.  Second, they say that because of Graveline's exclusion from the

ballot, the Plaintiff-Voters are unable to "cast a meaningful and effective vote"; they only

have major party candidates to choose from, but they believe that Michigan's attorney

general should be a non-partisan actor.

Plaintiffs contend that Michigan's statutory scheme functions as an absolute bar

to independent candidates for statewide office (i.e., the offices of governor, lieutenant

governor, attorney general, and secretary of state) seeking access to the general election ballot.  Additionally, they say that their freedom to associate for the advancement of their ideas and beliefs is hampered by the monopolization of the attorney general ballot by party candidates.

Defendants fail to address the combined burdens and collective impact argument made by Plaintiffs.  They also fail to address Plaintiffs' argument that Michigan's long history of failing to qualify an independent candidate for statewide office has served to exclude all independent candidates for attorney general from the ballot for thirty years, and that this failure should be considered by the Court as a reliable indicator of the unconstitutionality of Michigan's statutes.

The Court finds that Plaintiffs meet their burden to show that the character and magnitude of their injuries is significant and that the Michigan statutes – in combination – severely burden the constitutional rights not only of Graveline, but also of the Plaintiff-Voters.  On balance, the interests that Defendants seek to protect – guaranteeing that independent candidates have a "modicum of support" and protecting the integrity of the election process by regulating the number of candidates on the ballot to avoid voter confusion – are not sufficiently weighty to justify the reach and breadth of the challenged statutes.  In addition, it appears that there are less restrictive means by which Defendants can achieve their goals.

Accordingly, the Court finds that Plaintiffs show they have a strong likelihood of success on their claims that Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) are unconstitutional as applied to them, in relation to Graveline's independent candidacy for Michigan attorney general.

Plaintiffs' motion for preliminary injunction is **GRANTED**.

## II.     BACKGROUND

### A.     Michigan's Current Ballot Access Laws

To be eligible for the office of Michigan Attorney General, a person must be a registered and qualified elector in the State of Michigan on the date that he or she is nominated.  See Mich. Comp. Laws § 168.71.  Beyond that, Michigan law provides different filing and eligibility requirements for Attorney General candidates based on their affiliation and/or candidacy type:

Major Party Candidates:  Candidates for Attorney General from a major party (i.e., Republican, Democratic, and Libertarian Parties) are nominated at their party's nominating convention, which must be held "not less than 60 days before the general November election."  Mich. Comp. Laws § 168.591(1).  This year, that date falls on September 7, 2018.  Party officials then have one business day to file an Affidavit of Identity and Certificate of Nomination documenting the person nominated.  § 168.686.  Candidates from these parties do not have to circulate nominating petitions or obtain signatures in support of their candidacies.

Minor Party Candidates:  Candidates for Attorney General from a minor party (i.e., a party from which no candidate received "at least 5% of the total vote cast for all candidates for secretary of state at the last preceding election at which a secretary of state was elected") are nominated at their party's nominating convention, which must be held no later than the August primary election.  Mich. Comp. Laws §§ 168.686a(1), 168.532.  This year, the primary election was held on August 7, 2018.  Party officials then have one business day to file an Affidavit of Identity, Certificate of Nomination, and

a Certificate of Acceptance for their selected candidates.  § 168.686a(4).  Candidates from these parties do not have to circulate nominating petitions or obtain signatures in support of their candidacies.

Independent Candidates:  To be placed on the general election ballot, a candidate for Attorney General without political party affiliation, like Graveline, must file an Affidavit of Identity and qualifying petition with at least 30,000 signatures of registered voters no later than "the one hundred-tenth day before the general election."  Mich. Comp. Laws §§ 168.590c(2), 168.544f.  This year, the filing deadline fell on July 19, 2018.  To ensure they have enough valid signatures, unaffiliated candidates may submit as many as 60,000 signatures.  § 168.544f.  However, a candidate can only begin collecting signatures 180 days before the deadline, and, as part of the minimum number of signatures requirement, a qualifying petition must be signed by at least 100 registered voters in each of at least half of Michigan's 14 congressional districts.  *See* § 168.590b(3),(4).

Write-In Candidates:  A write-in candidate for Attorney General must file a Declaration of Intent with the Secretary of State by October 26, 2018.  Mich. Comp. Laws § 168.737a(1).

### B.      Graveline's Campaign Efforts

Graveline filed a Statement of Organization announcing his campaign for Michigan Attorney General on June 4, 2018.  As alleged in the complaint, Graveline began collecting signatures on June 7, 2018.  Over the next 42 days – up until the July 19, 2018 deadline for submission of his nominating petition – he and 231 volunteers collected 7,899 signatures for submission.  Graveline supplemented volunteer efforts by

retaining a professional signature-gathering firm, SMI Enterprises. SMI charged $6 per "billable signature" and collected over 6,000 signatures for a total expense to his campaign of $37,258. A billable signature is defined as a signature that is collected, processed, and reviewed for any apparent defects; SMI guaranteed that at least 75% of the billable signatures it collected would be valid.

Despite these efforts, Graveline fell well short of the minimum number of required signatures; over the 42 days, his campaign collected 14,157 signatures, with at least 100 signatures in 12 of Michigan's 14 congressional districts, at a cost of approximately $38,000 and with over 1,000 volunteer hours spent. Graveline attempted to file his nominating petition on July 19, 2018, but the Bureau of Elections rejected his filing as incomplete.

Graveline and Plaintiff-Voters – Willard Johnson, Michael Leibson, and Kellie Deming – filed this case on July 27, 2018. Each of the Plaintiff-Voters is a registered Michigan voter who wishes to vote for Graveline as an independent candidate for Attorney General.

Plaintiffs' complaint contains three causes of action; each asserts a violation of First and Fourteenth Amendment rights. In Count I, Plaintiffs allege Mich. Comp. Laws § 168.590c(2) is facially unconstitutional because its filing deadline unduly burdens independent candidates for office and is not narrowly tailored to meet a compelling or legitimate state interest. In Count II, Plaintiffs allege that § 168.590c(2) is unconstitutional as applied in combination with the requirements in §§ 168.544f and 168.590b(4), because adding the signature requirements to the deadline imposed in § 168.590c(2) multiplies the undue burden on Plaintiffs, and the requirements are not

narrowly tailored to serve a compelling state interest. Count III sets forth the same as applied challenge as Count II, but solely on behalf of Plaintiff-Voters, as a violation of their rights to cast effective votes.

The Defendants are Ruth Johnson, in her official capacity as Michigan's Secretary of State, and Sally Williams, in her official capacity as the Director of Michigan's Bureau of Elections (collectively, "the State").

Plaintiffs seek an order: (1) declaring Mich. Comp. Laws § 168.590c(2) unconstitutional on its face; (2) declaring §§ 168.590c(2), 168.544f, and 168.590b(4) unconstitutional "as applied in combination to Plaintiffs"; and (3) directing the State to place Graveline on the ballot as an independent candidate for Attorney General in the upcoming November 2018 election. They also seek an award of attorney fees pursuant to 42 U.S.C. § 1988.

On August 3, 2018, Plaintiffs filed a motion for preliminary injunction; the motion is fully briefed. On August 22, 2018, the Court held a hearing. During the hearing, Plaintiffs abandoned their Count I facial challenge to § 168.590c(2). Thus, the Court need only analyze Plaintiffs' as applied challenge to the statutory scheme as set forth in Counts II and III.

### III.    PRELIMINARY INJUNCTION STANDARD

"A district court must balance four factors when considering a motion for a preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of*

*Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012). "In First Amendment cases, 'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits [since] the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the state action.'" *Bays*, 668 F.3d at 819 (citations omitted). A preliminary injunction is an extraordinary remedy that will only be granted if Plaintiffs show that circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## IV.    ANALYSIS

An independent candidate for Michigan attorney general will not appear on the general election ballot unless he or she satisfies the early filing deadline and signature and distribution requirements in Mich. Comp. Laws §§ 168.590c, 168.544f, and 168.590b(4), described earlier.

Ballot access laws, such as these, "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *see also Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters." (citation omitted)).

Although "[b]oth of these rights . . . rank among our most precious freedoms," *Williams*, 393 U.S. at 30, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution," *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006). Indeed, states must enact reasonable regulations to

ensure campaigns and elections are orderly and fair. *Id.*; *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). As such, not all election laws are subjected to heightened scrutiny analysis. *Id.* The Supreme Court set forth the appropriate analytical framework for reviewing state election regulations in *Anderson* and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under the *Anderson-Burdick* framework, the Court first looks at the "character and magnitude of the asserted injury" to Plaintiffs' asserted constitutional rights. *Anderson*, 460 U.S. at 789. After assessing Plaintiffs' injury, the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* In doing this, the Court must "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* Finally, the Court must weigh these factors to determine whether the state law is constitutional. *Id.* The level of scrutiny "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434.

"When a state promulgates a regulation which imposes a 'severe' burden on individuals' rights, that regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (quoting *Burdick*, 504 U.S. at 434); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest."). "If regulations enacted do not seriously burden a plaintiff's rights, a state's important

regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

## A. The Character and Magnitude of Plaintiffs' Asserted Injury

First, the Court must determine whether the burdens imposed by the statutes are severe based on the "character and magnitude" of Plaintiffs' asserted injury. As the Sixth Circuit instructed, "to accurately apply this test, [the Court] must first determine the exact nature of the burden placed upon [independent attorney general candidates] and their voter-supporters." *Libertarian Party of Ohio*, 462 F.3d at 586.

### i. *The Character of Plaintiffs' Rights*

#### a. What Rights Do Plaintiffs Say are Burdened?

Plaintiffs allege Michigan's regulations harm them in several ways, including by: (1) infringing upon Graveline's right to appear on the November general election ballot as an independent, non-partisan candidate for attorney general; (2) violating the Plaintiff-Voters' right to "cast a meaningful and effective vote"; and (3) hindering their freedom to associate for the advancement of their political beliefs by precluding independent candidates for attorney general from qualifying for the ballot.

#### b. What Do Plaintiffs Rely on to Say This is a Significant Burden?

Plaintiffs say Michigan's ballot access statutes significantly burden their rights because the deadline requires that independent candidates conduct their petition drives well before the major party nominees are known, and before voters are paying attention to, much less actively engaged in, the electoral process. They contend that the early filing deadline imposed by § 168.590c(2) is even more burdensome as applied in

conjunction with the high signature requirement imposed by § 168.544f and the signature distribution requirement in § 168.590b(4).

Plaintiffs say Michigan's 30,000-signature requirement for independent candidates for statewide office is among the most restrictive in the nation; only five states impose higher requirements. In support of this assertion, Plaintiffs rely on the declaration of Richard Winger, who has been accepted as an expert witness concerning ballot access for minor parties and independent candidates in ten states. [*See* Winger Declaration, ECF No. 1-2, PgID 20, 22]; *see also Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1348 (N.D. Ga. 2016), *aff'd*, 674 Fed. Appx. 974 (11th Cir. 2017) ("Courts have considered Mr. Winger's expert testimony in many other cases and this Court finds that he is a reliable witness. Moreover, the Court primarily has relied on Mr. Winger as a gatherer of data, and there is no suggestion here that the data are inaccurate.").

The State does not challenge the opinion of Winger, nor does it contradict his conclusions. The Court accepts his conclusions as true for purposes of considering Plaintiffs' motion.

Plaintiffs say the difficulty of complying with Michigan's high signature requirement is further compounded by the substantial financial and human resources needed to satisfy the distribution requirement, which necessitates fielding petition circulators in half the congressional districts in the state. Plaintiffs say their efforts to comply with Michigan's statutes – as summarized above – demonstrate the nature of these burdens. Though Graveline spent approximately $38,000 and received over 1,000 volunteer hours from 231 individuals, his campaign only made it roughly halfway

to Michigan's high signature requirement. The State says this is due to Graveline's late start in collecting signatures.

Plaintiffs argue that, taken together, Michigan's provisions impose burdens so severe that they function as an absolute bar to independent candidates for statewide office seeking access to Michigan's general election ballot.

c.    Analyzing the Character of Plaintiffs' Rights

The nature of Plaintiffs' alleged injuries involve some of our most fundamental rights and go to the heart of being able to effectively participate in the election process; indeed, "[t]he right to cast an effective vote 'is of the most fundamental significance under our constitutional structure[,]' and [t]he rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon." *Libertarian Party of Ohio*, 462 F.3d at 585 (quoting *Burdick*, 504 U.S. at 433); *see also California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views."); *Green Party of Mich. v. Land*, 541 F. Supp. 2d 912, 917 (E.D. Mich. 2008); *Mogk v. City of Detroit*, 335 F. Supp. 698, 700 (E.D. Mich. 1971) ("*Reynolds*, *supra*, and *Williams*, *supra*, hold that a citizen has a right to vote effectively and, by logical extension, that means that he is to be given a wide latitude in his choice of public officials. His right to support a candidate of his choice – including himself – cannot be arbitrarily restricted."); *Bolanowski v. Raich*, 330 F. Supp. 724, 727 (E.D. Mich. 1971) ("The Supreme Court has also made it clear that when the right of association and the right to vote effectively are infringed, 'only a compelling state interest in the regulation of

a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. *NAACP v. Button*, 371 U.S. 415, 438 (1963)'" (quoting *Williams*, 393 U.S. at 31)).

### ii. *The Magnitude of Plaintiffs' Injury*

In determining the magnitude of the burden imposed by a state's election laws, the Sixth Circuit instructs the Court to consider the associational rights at issue, including: (1) "evidence of the real impact the restriction has on the process"; (2) "whether alternative means are available to exercise those rights"; and (3) "the effect of the regulations on the voters, the parties and the candidates." *Libertarian Party of Ohio*, 462 F.3d at 587. Courts must also take into account "the interests of the state relative to the scope of the election." *Id.* The Court will address the interests of the State after determining the severity of the burden imposed by the challenged regulations.

Importantly, the Court must consider the "combined effect" of the challenged regulations, rather than each statute's requirement by itself. *See id.* at 586 ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights.").

Consideration of these three associational rights leads the Court to conclude that the combined effect of Michigan's statutory scheme severely burdens Plaintiffs' fundamental rights.

### a. Evidence of the Real Impact the Restrictions Have Had on the Process Supports a Finding of Severe Burden

In evaluating the "real impact" election laws have on the process, a number of courts examine historical data on ballot access that independent candidates (or minor

parties) have been able to obtain.  *Libertarian Party of Ohio*, 462 F.3d at 589-90 ("While

not conclusive in and of itself, the Supreme Court has noted that a historical record of

parties and candidates being unable to meet the state's ballot-access requirements is a

helpful guide in determining their constitutionality.").  Indeed, in *Storer*, the Supreme

Court remanded the case and instructed the district court to consider whether

> "a *reasonably diligent* independent candidate [could] be expected to
> satisfy the signature requirements, or will it be only rarely that the
> unaffiliated candidate will succeed in getting on the ballot? Past
> experience will be a helpful, if not always an unerring, guide: it will be one
> thing if independent candidates have qualified with some regularity and
> *quite a different matter if they have not*."

*Storer*, 415 U.S. at 742 (emphasis added); *Fishbeck v. Hechler*, 85 F.3d 162, 164-65

(4th Cir.1996) (examining historical data to determine severity of burden on minor party

candidates).  *See also Jenness v. Fortson*, 403 U.S. 431, 438 (1978) (considering

whether state's elections laws "operate[d] to freeze the political status quo").

Michigan's history is telling.

The current Michigan statutory scheme was adopted in 1988.  In the thirty years

since, no independent candidate for statewide office has qualified for the ballot.  This

historical evidence paints a clear picture of the "real impact the restriction[s] ha[ve]" on

Plaintiffs and demonstrates the severe burden Michigan's statutory scheme has on

independent candidates for statewide office.

Although Graveline was a *reasonably diligent* candidate, he was unable to satisfy

all the statutory requirements.  Because independent candidates for statewide office

have *never* qualified for the ballot under Michigan current regulations – let alone

qualified with some regularity – the Court finds that the State's election laws "operate to

freeze the political status quo," and effectively bar independent candidates from

13

accessing the ballot. *See Jenness*, 403 U.S. at 438; *Storer*, 415 U.S. at 742. *See also Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) (finding that Arizona filing deadline for independent candidates "severely burdened" speech, voting, and associational rights of independent candidate and supporters where history showed that no independent candidate had appeared on the ballot since 1993, when Arizona changed its filing deadline from 10 days after the primary election to 75 days before the primary election); *Delaney v. Bartlett*, 370 F. Supp. 2d 373, 377-78 (M.D.N.C. 2004) (finding that North Carolina regulation "severely disadvantage[d]" independent candidates and warranted strict scrutiny where the "historical evidence of ballot exclusion" of independent candidates in comparison with party candidates showed that "only one unaffiliated candidate has been placed on the ballot as a contender for statewide office" over the preceding 20 years).

The fact that no independent candidate for statewide office has ever satisfied Michigan's current statutory scheme to qualify for the ballot demonstrates "that the regulations impose a severe burden that has impeded ballot access." *See Brewer*, 531 F.3d at 1038.

        b.    <u>No Alternative Means are Available to Plaintiffs to Exercise Their Rights</u>

During the hearing, the State argued that Michigan's statutory scheme does not impose a severe burden on Graveline or the Plaintiff-Voters because Michigan allows an independent candidate for attorney general who did not qualify for the ballot to run as a write-in candidate by filing a Declaration of Intent by October 26, 2018. This argument is unavailing. The Supreme Court has indicated that "[t]he realities of the electoral process . . . strongly suggest that 'access' via write-in votes falls far short of access in

terms of having the name of the candidate on the ballot." *Lubin v. Panish*, 415 U.S. 709, 719 n. 5 (1974); *see also Anderson*, 460 U.S. at 799 n. 26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidates name appear on the printed ballot").

There are no alternative means for Graveline to appear on the ballot as an independent candidate. Moreover, because the Michigan statutory scheme has prevented independent candidates for attorney general from accessing the ballot, Plaintiff-Voters have no alternative means to exercise their right to cast their vote effectively; while they could write in Graveline as an independent candidate, this is not an adequate substitute. This factor strongly suggests that the challenged regulations severely burden Plaintiffs' rights.

c.     The Combined Effect of the Regulations Demonstrates that They Severely Burden Plaintiffs' Rights

In analyzing the issues presented by this case, the Court is not limited to an examination of how the statutes at issue affect the associational rights of the Plaintiff-Voters and Graveline's ability to appear at all on the general election ballot. In cases analyzing ballot access, "the Supreme Court [also] 'focuses on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.'" *Libertarian Party of Ohio*, 462 F.3d at 588 (internal brackets omitted) (quoting *Anderson*, 460 U.S. at 793. "'A burden that falls unequally on . . . independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates – and of particular importance – against those

voters whose political preferences lie outside the existing political parties.'" *Id.* (quoting *Anderson*, 460 U.S. at 793-94).

Courts further note that "[u]naffiliated candidates enhance the political process by challenging the status quo and providing a voice for voters who feel unrepresented by the prevailing political parties." *Delaney*, 370 F. Supp. 2d at 377 (citing *Anderson*, 460 U.S. at 794). Moreover, "independent candidates in particular play an important role in the voter's exercise of his or her rights." *Green Party of Georgia*, 171 F. Supp. 3d at 1352. In light of this, and because independent candidates are more responsive to emerging issues and less likely to wield long term or widespread governmental control, "independent candidacies must be accorded even more protection than third party candidacies." *Cromer v. South Carolina*, 917 F.2d 819, 823 (4th Cir.1990).

Michigan's election laws fail to account for these important considerations. The historical evidence shows that no independent candidate for statewide office has appeared on the ballot since 1988. This is twice as long as the historical evidence considered in *Brewer*, *supra*, and ten years longer than the historical data considered in *Delaney*, *supra*; both courts held that the effect of the state laws' exclusion of independent candidates from the ballot severely burdened the rights of the independent candidates and their supporters.

The same is true here. "By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, [Michigan's ballot access regulations] threaten to reduce diversity and competition in the marketplace of ideas." *See Anderson*, 460 U.S. at 794.

In sum, the Court finds that Plaintiffs satisfy their burden to show that, as applied, the combination of Michigan's ballot access regulations severely burdens their fundamental rights under the First and Fourteenth Amendments.

### iii. *The State Does Not Address the Combined Effect of the Regulations and Ignores the Historical Evidence*

The State spends a significant portion of its brief arguing that Plaintiffs' rights are not severely burdened because other courts have upheld state laws requiring a candidate or party to collect 30,000 signatures to gain access to the ballot. Nowhere, however, does the State discuss the combined effect of the statutory scheme. This is contrary to the applicable standard recognized by the Supreme Court and set forth in *Libertarian Party of Ohio*. *See id.*, 462 F.3d at 593 ("It is this combined burden on the party's rights that we must address.").

By failing to address the combined effect of the regulations, the State – like the defendant in *Libertarian Party of Ohio* – "misses the point" and fails to address the appropriate inquiry. *See id.* at 592-93.

Beyond discussing the signature requirement, the State summarily relies on *Erard v. Johnson*, 905 F. Supp. 2d 782 (E.D. Mich. 2012), in which a judge in this district determined that Michigan's ballot access requirements for a new minor political party – which were similar to the requirements for independent candidates challenged here – did not severely burden the plaintiff's rights. *Id.* at 806.

In blindly relying on *Erard*, the State failed to address several material differences between that case and this one.

First, *Erard* focuses on new (minor) party ballot access as opposed to an independent candidate. As Plaintiffs point out, this is a distinction of consequence. *See*

*Storer*, 415 U.S. at 745 ("the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other").  Of particular note is the fact that, in 2002, Michigan made it easier for minor parties to access the ballot.  *See Erard*, 905 F. Supp. 2d at 804-05.

In addition, in reaching its conclusion that Michigan's ballot access regulations did not severely burden new political parties, *Erard* relied significantly on historical evidence showing that minor political parties were able to access the ballot: "perhaps *most significant*[] is that minor political parties have a history of gaining access to Michigan's ballots."  *Id.* at 803-04 (emphasis added).  As discussed in depth above, the historical evidence in this case is the polar opposite of "perhaps [the] most significant" evidence *Erard* used to conclude that the regulations did not impose a severe burden.

Moreover, the relevant date for comparing the filing deadline in *Erard* was the primary election deadline, which has no relevancy here.  Because major parties will select their attorney general nominees at their nominating conventions, which can be as late as September 7, 2018, that date is what is most relevant to Plaintiffs' claims.  That date is 50 days after Graveline's deadline to file.  Although Plaintiffs raise this distinction, the State fails to address it.

With the foregoing distinctions in mind, the State's reliance on *Erard* – and *conclusory* assertion that the regulations do not severely burden independent candidates for statewide office because *Erard* found that similar requirements did not severely burden the rights of *new political parties* – ignores the principle that, "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike . . . ."  *Green Party of Tennessee v. Hargett*, 791 F.3d

684, 694 (6th Cir. 2015) (quoting *Jenness*, 403 U.S. at 441-42). Like in *Green Party of Tennessee*, the differences between independent candidates and minor parties, and the historical lack of access to the ballot for independent candidates for statewide office in Michigan, "justify having less onerous burdens on [independent candidates] than [minor] political parties." *See id.*

In sum, the State fails to address the combined effect of the statutory scheme on Plaintiffs' rights, and it ignores the historical evidence showing independent candidates for statewide office have had no meaningful access to the ballot. The State falls well short of demonstrating that the collective effect of the regulations does not severely burden Plaintiffs' rights.

### B.     The Interests of the State

Because the combined application of Michigan's ballot access regulations severely burdens Plaintiffs' rights, the State must set forth precise interests of compelling importance and show that the regulations are necessary and narrowly tailored to advance those interests. *See Timmons*, 520 U.S. at 358; *Anderson*, 460 U.S. at 789.

Despite this requirement, the State, like the State in *Libertarian Party of Ohio*, "has made no clear argument regarding the precise interests it feels are protected by the regulations at issue in the case, relying instead on generalized and hypothetical interests identified in other cases." *See id.*, 462 F.3d at 593.

The State asserts the following generalized interests:

But even if this Court determines that the challenged provision substantially burdens First Amendment laws or invidiously discriminates against independent candidates, triggering strict scrutiny, the State has a compelling interest in protecting the integrity of its election process, *see*

19

> *American Party*, 415 U.S. at 781[,] in preventing the clogging of the state's election machinery, and in avoiding voter confusion. *See Socialist Workers Party*, 412 U.S. at 589 (citing *Bullock v. Carter*, 405 U.S. 134, 145 (1972)); *see also Socialist Party*, 412 Mich. at 591, n. 14 (noting that the Supreme Court in *American Party of Texas v. White* described "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion" as compelling state interests). The Supreme Court has also recognized the State's interest in screening out frivolous candidates and discouraging party-splintering and factionalism. *Timmons*, 520 U.S. at 367.
>
> Michigan has a recognized interest in ensuring that candidates for statewide office demonstrate a modicum of statewide support, and to do so, voters must necessarily publicly show their support at the petition stage.

[ECF No. 8, PgID 123-24]. This is the extent of the State's effort to address its interests.

At the August 22 hearing, the State argued most vociferously that candidates must demonstrate a modicum of support.

Plaintiffs contend that the State's position that 30,000 signatures is the minimal number necessary for candidates for statewide office to demonstrate a "modicum of support" is a completely arbitrary number. The Court agrees. For example, in Mich. Comp. Laws § 168.544f, the State sets forth the number of signatures of qualified and registered electors necessary for nominating petitions, based on the population of the district. A candidate from a district with a population up to 4,999,999 – just one person short of the 5 million statewide figure – need only obtain a minimum of 12,000 signatures on a qualifying petition to make it on a ballot, as opposed to the 30,000 minimum needed for a population of just one more – albeit on a statewide qualifying petition. That a statewide candidate must also obtain at least 100 signatures from half of Michigan's 14 congressional districts does not account for this discrepancy.

If demonstration of a "modicum of support" is the driver for the number of signatures that must be obtained, what is the State's rationale for requiring 18,000 more signatures on a qualifying petition with a population difference of one person? The United States Supreme Court addressed such a discrepancy in *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). There, the Court considered an Equal Protection challenge to the Illinois Election Code, which required new political parties and independent candidates to obtain the signatures of 25,000 qualified voters in order to appear on a ballot for statewide elections, but applied a different – and higher – standard in elections for offices in political subdivisions of the state. *Id.* at 175-76. The scheme required potential candidates for office in the City of Chicago to collect more than 25,000 signatures. *Id.* The Court held the discrepancy rendered the Illinois Election Code unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 186-87.

The Court recognized that the size of the pool from which signatures are requested could have significance in explaining the different standards, but also said that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Id.* at 185 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973)). The Supreme Court held that discrepancies tied solely to a population standard and "historical accident," without more, "cannot constitute a compelling state interest." *Id.* at 187.

While the State's interests certainly are "important regulatory interests," *see Anderson*, 460 U.S. at 786, they are far from the precise interests required under the *Anderson-Burdick* framework to justify ballot access laws that severely burden a

candidate's and individual voters' rights. *See Libertarian Party of Ohio*, 462 F.3d at 593 ("Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment rights."). Thus, like in *Libertarian Party of Ohio*, the State's reliance on generalized and unsupported interests are insufficient to justify the statutory scheme's severe burden on Plaintiffs' First and Fourteenth Amendment rights. *Id.* at 593-94. Moreover, the State does not show – much less attempt to demonstrate – that the challenged statutes are narrowly tailored to meet their interests, as required under the *Anderson-Burdick* framework.

The State falls far short of satisfying its burden to show that the severe burdens caused by the scheme are justified.

### C.     Other Preliminary Injunction Factors

The remaining preliminary injunction factors – whether Plaintiffs would suffer irreparable injury absent an injunction; whether an injunction would cause substantial harm to others; whether the public interest would be served by an injunction – weigh in favor of an injunction. Because Plaintiffs show a strong likelihood that Michigan's ballot access regulations violate their First and Fourteenth Amendment rights as applied to them, they would suffer irreparable injury without an injunction; this outweighs the interest considered in the other factors. *See Bays*, 668 F.3d at 819; *Cnty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002) ("[W]hen First Amendment rights are implicated, the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights.").

22

## V. CONCLUSION

Plaintiffs demonstrate both a strong likelihood of success on Counts II and III of their complaint and that the circumstances justify a preliminary injunction.

Accordingly, the Court **GRANTS** Plaintiffs' motion for preliminary injunction.

## VI. REMEDY

Plaintiffs sought – and won – a declaration that Michigan's election laws – Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) – are invalid as applied to them. The Court makes no finding that Michigan's election laws have no constitutional application whatsoever. Consideration of that may be left to another day.

As a court of equity, this Court has flexibility to fashion a remedy that is in line with its finding that the above statutes are unconstitutional as applied to these Plaintiffs. *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."). The Court can go far in crafting a remedy that gives due attention to the legitimate concerns of all parties. *Id.*

Plaintiffs ask the Court to simply place Graveline on the general election ballot without signature verification. But such a remedy would not honor Michigan's compelling state interest to preserve the integrity of its electoral process and regulate the number of people on the general election ballot. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) ("*Jenness* and *American Party* establish with unmistakable clarity that States have an 'undoubted right to require candidates to make

23

a preliminary showing of substantial support in order to qualify for a place on the ballot.'").

On the other hand, the status quo in Michigan dishonors Plaintiffs' constitutional rights to ballot access and a wide latitude in their choice of public officials; to freely associate and advance their political beliefs; and to cast their votes meaningfully and effectively.

With this in mind, the Court picks a number that is supported by the limited evidence in this case, and which it "believes provides a constitutionally valid balancing of the competing interests at stake in this dispute." *See Jones v. McGuffage*, 921 F. Supp. 2d 888, 902 (N.D. Ill. 2013) (finding that 3,444 valid signatures was sufficient for showing "substantial modicum of support").

Based on an analysis of election returns for all 50 states over fifty years, Plaintiffs' expert opines that states that require 5,000 signatures for general election ballot access for independent candidates or new parties for statewide office will not have a crowded ballot. [*See* Winger Declaration, ECF No. 1-2, PgID 22]. It would follow that such states believe that this same signature requirement of not less than 5,000 signatures can satisfactorily demonstrate a sufficient level of community support for a candidate for statewide office in Michigan.

The Court accepts Winger's declaration as evidence on these points because: (1) Winger's conclusions appear to be based in fact and supported by reliable data; (2) Winger has been accepted as an expert witness concerning ballot access for minor parties and independent candidates in 10 states; and (3) the State does not challenge his declaration or any conclusion he makes. This is a preliminary finding only; the Court

does not certify him as an expert on other issues, and the State is not foreclosed from challenging his reliability as a witness if this case proceeds.

The Court orders:

1.  Graveline must immediately present his qualifying petition – with all materials he tried to submit on July 19, 2018, including the signatures of registered voters that he collected – to the Bureau of Elections;

2.  The State must accept Graveline's filing as complete and determine the validity of the signatures in time to place Graveline on the ballot if he has sufficient valid signatures; and

3.  If Graveline has at least 5,000 valid signatures, and at least 100 valid signatures from registered voters in each of at least half of the 14 congressional districts of the state, his name must be placed on the November 6, 2018 general election ballot as an independent candidate for the Office of Michigan Attorney General.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: August 27, 2018