# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: September 06, 2018

Ms. Denise C. Barton
Ms. Heather S. Meingast
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48116

Mr. William Price Tedards Jr.
Law Offices
1101 Thirtieth Street, N.W.
Suite 500
Washington, DC 20007

    Re:  Case No. 18-1992, *Christopher Graveline, et al v. Ruth Johnson, et al*
       Originating Case No. : 2:18-cv-12354

Dear Counsel,

 The Court issued the enclosed opinion today in this case.

                Sincerely yours,

                s/Cathryn Lovely
                Opinions Deputy

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0463n.06

No. 18-1992

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |
|---|---|
| CHRISTOPHER GRAVELINE et al., ) | |
| ) | |
| **Plaintiffs-Appellees,** ) | ON APPEAL FROM THE |
| ) | UNITED STATES DISTRICT |
| v. ) | COURT FOR THE EASTERN |
| ) | DISTRICT OF MICHIGAN |
| RUTH JOHNSON, Secretary of State of ) | |
| Michigan et al., in their official capacities, ) | |
| ) | **OPINION** |
| **Defendants-Appellants.** ) | |
| ) | |

FILED
Sep 06, 2018
DEBORAH S. HUNT, Clerk

Before: MOORE, GILMAN, and GRIFFIN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** This case is about the constitutionality of a constellation of Michigan laws that, in combination, govern an independent candidate's ability to be on the ballot for election as state attorney general. Plaintiff Christopher Graveline attempted to get his name on the November general election ballot as an independent, non-partisan candidate for attorney general. R. 1-3 (Compl. Ex. B ¶ 16) (Page ID #35–36). The other plaintiffs are registered Michigan voters who support Graveline's candidacy and who intend to vote for him. R. 1-4 (Compl. Ex. C) (Page ID #39–40); R. 1-5 (Compl. Ex. D) (Page ID #42–43); R. 1-6 (Compl. Ex. E) (Page ID #45–46). Together they challenge the Michigan laws that set forth the requirements for Graveline's name to appear on the general election ballot.[1] Plaintiffs say these

---

[1]Graveline was able to comply with the requirements of Michigan Compiled Laws § 168.590b(4), that a petition be signed by "at least 100 registered electors in each of at least ½ of the congressional districts of the state," and so he does not contest that requirement.

Case 2:18-cv-12354-VAR-DRG ECF No. 19, PageID.243 Filed 09/06/18 Page 3 of 20
 Case: 18-1992 Document: 12-2 Filed: 09/06/2018 Page: 3 (3 of 20)

No. 18-1992, *Graveline et al. v. Johnson et al.*

laws deprive them of their rights to freedom of speech and association, equal protection, and due process under the First and Fourteenth Amendments to the United States Constitution.

## I. BACKGROUND

Michigan allows independent candidates for attorney general to be on the general election ballot if the candidate submits an affidavit and "qualifying petition." MICH. COMP. LAWS § 168.590c (2008). A qualifying petition must have at least 30,000 valid signatures and must be submitted no later than "the one hundred-tenth day before the general election." *Id.*; *id.* § 168.544f. The filing deadline for the November 6, 2018 election was July 19, 2018. Moreover, the signatures on a qualifying petition must be obtained within 180 days of the filing deadline. *Id.* § 168.590b(3). Therefore, the official process for an independent candidate trying to run for attorney general in the November 6, 2018 general election began in late January 2018—180 days prior to the July 19 deadline.

Graveline, however, waited to begin his campaign until June 4, 2018. R. 1-3 (Compl. Ex. B ¶ 9) (Page ID #33). His delay had to do with another set of laws: those governing the nomination of major party candidates for attorney general. Graveline decided to enter the race for attorney general only when "it became reasonably clear to [him] that the Democratic and Republican Parties would be nominating candidates who d[id] not subscribe to [his] ideals." *Id.* ¶ 7 (Page ID #32). Graveline began his candidacy after he resigned from his federal service as an Assistant United States Attorney. *Id.* ¶ 8 (Page ID #32–33).

In Michigan, the candidates for attorney general from the major political parties—Republican, Democratic, and Libertarian—are nominated at their party's convention rather than

2

No. 18-1992, *Graveline et al. v. Johnson et al.*

elected in a primary. The party must hold its convention "not less than 60 days before the general November election." MICH. COMP. LAWS § 168.591(1). This year, that deadline fell on September 7, 2018.[2] Given this law, an independent candidate likely would be ignorant of the identities of the major party candidates before the independent candidate filing deadline. Graveline decided to run after learning the identity of the candidate that the Democratic Party informally "endorsed" in April 2018 and the two candidates of the Republican Party who each "announced" at some undisclosed time. *Id.* ¶ 3 n.1 (Page ID #30); *id.* ¶ 4 (Page ID #4). The formal selection for those parties was to occur on August 25, 2018. *Id.*

From June 5 until the July 19 deadline, Graveline, along with 231 volunteers and a signature-gathering firm, collected 14,157 signatures. *Id.* ¶¶ 11, 15 (Page ID #34, 35). This effort required 1,000 hours of volunteer time and the expenditure of $38,000. *Id.* Graveline attempted to file his petition on July 19, but the State rejected it because it did not contain 30,000 signatures. R. 1-9 (Compl. Ex. H) (Page ID #57).

The plaintiffs filed suit in the United States District Court for the Eastern District of Michigan on July 27, 2018 and filed a motion for a preliminary injunction on August 3. R. 1 (Compl.) (Page ID #17); R. 4 (Pl.'s Mot. For Prelim. Inj.) (Page ID #91). After briefing and argument, the district court granted the motion and ordered that "(1) Graveline must immediately present his qualifying petition . . . to the Bureau of Elections; (2) The State must accept Graveline's filing as complete and determine the validity of the signatures in time to place Graveline on the

---

[2]The Republican and Democratic Parties held their nominating conventions on August 25, 2018. R. 1-3 (Compl. Ex. B ¶ 3 n.1) (Page ID #30).

3

No. 18-1992, *Graveline et al. v. Johnson et al.*

ballot if he has sufficient valid signatures; and (3) If Graveline has at least 5,000 valid signatures . . . [,] his name must be placed on the November 6, 2018 general election ballot as an independent candidate for the Office of Michigan Attorney General." R. 12 (Dist. Ct. Op. on Prelim. Inj. at 25) (Page ID #169).

The district court so ordered after finding that Plaintiffs were likely to succeed on the merits of showing that "the combination of Michigan's ballot access regulations severely burdens their fundamental rights under the First and Fourteenth Amendments." *Id.* at 17 (Page ID #161). The district court found also that Michigan "[fell] far short of satisfying its burden to show that the severe burdens caused by the scheme are justified." *Id.* at 22 (Page ID #166). Finally, the district court found that the remaining factors, "whether Plaintiffs would suffer irreparable injury absent an injunction; whether an injunction would cause substantial harm to others; [and] whether the public interest would be served by an injunction[,] weigh[ed] in favor of an injunction." *Id.*

Defendants filed a notice of appeal on August 29, 2018. The same day, Defendants filed a motion in the district court to stay the preliminary injunction pending appeal. R. 14 (Def.'s Mot. to Dist. Ct. for Stay) (Page ID #171). The motion for a stay included the Defendants' first affidavit and an argument from the State that it could not comply with the injunction based on its interpretation of the district court's order as requiring it to "determine the validity of each individual signature." *Id.* at 8 (Page ID #187). This is asserted by Defendants to be a departure from the Bureau of Elections' ordinary procedure, which involves a "face review" of signatures for disqualifications and random registration checks. *Id.*

4

No. 18-1992, *Graveline et al. v. Johnson et al.*

The district court denied the motion for a stay on August 30. Its order clarified that "nothing in the [preliminary injunction] suggest[ed] that the State should abandon its ordinary procedure for examining nominating petitions." R. 17 (Dist. Ct. Op. on Def.'s Mot. for Stay at 7) (Page ID #236).

On September 4, 2018, the defendants moved this court for a stay of the district court's injunction pending appeal. D. 6 (Appellant's Br.).

## II. ANALYSIS

In deciding whether to grant a stay of a preliminary injunction, "we consider (1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Coalition to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (internal quotation marks omitted). The first factor—the likelihood that the moving party will prevail on the merits of the underlying appeal—requires us to decide whether Defendants are "likely to be able to show that the district court abused its discretion in granting the preliminary injunction." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 380 (6th Cir. 2008). "We review de novo the legal conclusions made by the district court, and we review its factual findings for clear error, but our review of the district court's ultimate decision regarding injunctive relief is reviewed under the 'highly deferential' abuse-of-discretion standard." *Id.* (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)). We emphasize that we are not deciding the actual appeal of the order granting the preliminary injunction, but rather

5

No. 18-1992, *Graveline et al. v. Johnson et al.*

whether a stay of that preliminary injunction should be granted to Defendants. The Defendants as movants for the stay have the burden of persuasion. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

## A. Likelihood of Success on the Merits

Defendants have not shown that they are likely to succeed in showing that the district court abused its discretion by entering the preliminary injunction. The factors considered by the district court on the issuance of a preliminary injunction are similar to those for a stay: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012). Defendants argue that the district court erred in its assessment of Plaintiffs' likelihood of success on the merits when it "rejected Defendants' arguments that any burden caused by the[] statutes (1) was not severe and (2) was supported by the State's interests." D. 6 (Appellant's Br. at 7).

The framework for reviewing state election regulations, which the district court applied, was set forth by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* framework requires us to weigh the "character and magnitude of the asserted injury" to plaintiffs' constitutional rights against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789. The appropriate balance is determined by the magnitude of the burden. If the burden is severe, the regulation will be upheld only if it is "narrowly drawn to advance a

6

No. 18-1992, *Graveline et al. v. Johnson et al.*

state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). If the regulations are not a serious burden, the state's regulatory interests will likely justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

The burden here on Plaintiffs' constitutional rights is caused by the combination of (1) the amount of signatures Michigan requires—30,000, or about one percent of ballots cast in the prior election of an attorney general[3] and, (2) the timing of the collection and filing of those signatures—a candidate has 180 days to collect signatures that are to be filed by 110 days before the general election. These requirements fall between those at issue in two other decisions of this court. We upheld an Ohio law requiring independent congressional candidates to obtain signatures amounting to one percent of the electors in the relevant congressional district in *Lawrence v. Blackwell*, 430 F.3d 368, 370 (6th Cir. 2005). The filing deadline for the independent candidates' petitions was one day before the primary election. *Id.* But we held unconstitutional a different Ohio law governing minor political parties in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006). The law at issue in *Libertarian Party* required "minor" political parties to file a petition with an amount of signatures equal to one percent of the total votes cast in the previous election in order to participate in the primary, and thus to have a candidate on the general election ballot. *Id.* at 582–83. The petition was required to be submitted at least 120 days before the primary.

---

[3]*2014 Michigan Election Results*, MICHIGAN SECRETARY OF STATE (updated Sept. 28, 2016, 10:00 AM), https://miboecfr nictusa.com/election/results/14GEN/.

7

No. 18-1992, *Graveline et al. v. Johnson et al.*

The burden at issue in *Lawrence* was found to be neither severe nor inherently unreasonable in part because "all candidates seeking a place on the ballot in November must engage in substantial campaign work before the early primary." *Lawrence*, 430 F.3d at 373. The law at issue allowed an independent candidate to collect signatures up to the day before the primary, whereas the law applicable to party-affiliated candidates required them to file papers sixty days before the primary and then campaign for and win the party nomination. *Id.* "All candidates are burdened . . . but there is no particular group which feels the additional burden of being placed at a disadvantage with respect to the rest of the field." *Id.* We expressly emphasized that the filing deadline at issue was one day prior to the primary, and we acknowledged that many cases found that "early filing deadlines impose a severe burden." *Id.* at 374 and n.2.

Then, in *Libertarian Party*, we held that the Ohio law requiring minor parties to file a petition 120 days before the primary posed a severe burden because "[d]eadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. . . . Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party." 462 F.3d at 586. We noted that "the great weight of authority [] has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections," raising *Lawrence* as an example. *Id.* at 590. The deadline far in advance of the primary, in combination with a one-percent signature requirement, was a severe burden for that reason.

No. 18-1992, *Graveline et al. v. Johnson et al.*

Michigan's treatment of independent candidates for statewide office falls closer *to Libertarian Party* than to *Lawrence*. Graveline was required to submit his petition on July 19; the nominating conventions (there being no primaries) were required to be held by September 7, a 50-days-in-advance deadline. Although not as extreme as the 120 days in *Libertarian Party*, it is reasonable to conclude that this early deadline has the same effect of requiring an independent candidate "to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized." *Libertarian Party of Ohio*, 462 F.3d at 586. This is not requiring a state to "give independent candidates the advantage of jumping into a race in response to late-breaking events . . . when major parties do not have the same flexibility." *Lawrence*, 430 F.3d at 374. The major parties in Michigan remain able to nominate any candidate until the nominating convention.[4] Nor are independent candidates equally burdened, as was the case, crucially, in *Lawrence*. *Id.* at 373. Here, the major party candidates are not required to obtain advance support during the same time that an independent candidate must canvas for signatures.

All told, Michigan's system works to disadvantage independent candidates alone by requiring them to seek a significant number of signatures from an electorate that is not yet politically energized. We did uphold a similar numerical signature requirement in *Lawrence*, but in that case the late filing deadline alleviated the burden. And although the Supreme Court upheld a five-percent signature requirement in *Jenness v. Fortson*, 403 U.S. 431, 438 (1971), that signature requirement was analyzed using a less stringent framework than that required by

---

[4]There is no indication that the Democratic Party's endorsements were binding.

9

Case 2:18-cv-12354-VAR-DRG ECF No. 19, PageID.251 Filed 09/06/18 Page 11 of 20
Case: 18-1992 Document: 12-2 Filed: 09/06/2018 Page: 10 (11 of 20)

No. 18-1992, *Graveline et al. v. Johnson et al.*

*Anderson* and *Burdick*. *See Anderson*, 460 U.S. at 817 (Rehnquist, J., dissenting) (distinguishing the standard used in *Jenness* from the "narrowly tailored" test applied in *Anderson*); *see also Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340 (N.D. Ga. 2016) (finding a one-percent signature requirement to be a severe burden and setting a requirement of 7,500 signatures), *aff'd* 674 F. App'x 974 (11th Cir. 2017) ("The judgment of the district court is affirmed based on the district court's well-reasoned opinion."). The numerical signature requirement here, in combination with the signature collection window and filing deadline, is a severe burden on independent candidates and those who wish to vote for them.

Michigan's history reveals the severity of this burden. No independent candidate for statewide office has managed to complete a qualifying petition since the current laws went into effect in 1988. R. 1-2 (Compl. Ex. A ¶ 5) (Page ID #21).[5] True, we do not know how many independent candidates have sought statewide office, but that omission is the result of Michigan's practice of rejecting petitions with insufficient signatures. D. 6 (Appellant's Br. at 63); *see also* R. 1-9 (Compl. Ex. H) (Page ID #57). Although Graveline delayed the commencement of his campaign, the fact that no independent candidate for statewide office has appeared on the ballot in thirty years indicates that a reasonably diligent candidate could not meet the signature requirements. *See Storer v. Brown*, 415 U.S. 724, 742 (1974) (stating that "[p]ast experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.").

---

[5] Ross Perot and Ralph Nader both were on Michigan's ballots as presidential candidates, although Nader achieved that with significant help from Michigan's Republican Party. *Id.*

No. 18-1992, *Graveline et al. v. Johnson et al.*

This severe burden leaves us to assess whether Michigan's laws are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434. The State's generalized interests are the integrity of its election process, the prevention of voter confusion, and the screening out of frivolous candidates, among others. R. 8 (Def.'s Opp. to Mot. for Prelim. Inj. at 18–19) (Page ID #123–24). These are important state interests. But the State presented no affidavit in response to the motion for a preliminary injunction and made no argument as to why these specific measures are necessary. There is no indication that Michigan's laws are narrowly drawn to protect its interests.

Based on the above, it is likely that Defendants would not succeed on appeal in showing that the district court abused its discretion when it assessed that, in combination, Michigan's election laws created a severe burden on Plaintiffs' rights that was not narrowly tailored to a compelling interest and, based on the above and the other preliminary injunction factors, granted a preliminary injunction.

### B. Harm to Defendants

Defendants have articulated no irreparable harm that will befall the State in the absence of a stay, excepting the general harm of being enjoined from effectuating its statutes. D. 6. (Appellant's Brief at 19). Defendants' assertions below of inability to comply with the injunction are unpersuasive because we interpret the district court's preliminary injunction as the district court itself interpreted it: an order to comply with the ordinary procedure for examining nomination petitions. Defendant Sally Williams, Director of Michigan Bureau of Elections, has said that such a review could be completed in four business days. R. 14-2 (Def.'s Mot. to Dist. Ct. for Stay Ex.

11

No. 18-1992, *Graveline et al. v. Johnson et al.*

1 ¶ 22) (Page ID #216–17). Graveline filed his petition with the Secretary of State on August 28, leaving more than enough time for review before the September 7 deadline. *Id.* ¶ 23 (Page ID #217).[6]

### C. Substantial Harm to Others and Public Interest

In contrast to the de minimis showing of harm to Defendants, Plaintiffs would face a substantial harm if a stay were granted: Graveline's name would not appear on the ballot and the voter plaintiffs would be unable to vote for him. Finally, there is no indication that the public interest would be harmed in the absence of the stay, and the public interest is served in assuring Plaintiffs' constitutional rights.

### D. Remedy

Finally, Defendants take issue with the district court's imposition of a 5,000-signature requirement, as opposed to Plaintiffs' request for an unconditional order that Graveline's name appear on the ballot. But far from "impos[ing] [its] own idea of democracy" on the State, the district court crafted this remedy to allow some portion of Michigan's democratically enacted statute to survive. Surely some signature requirement better serves the State's asserted interests than none at all. And to the extent Defendants dislike the number, they failed to introduce any evidence into the record or argue for a different requirement at the preliminary injunction hearing, despite ample prompting to do so. The district court's remedy was within its equitable discretion. *See McCarthy v. Briscoe*, 429 U.S. 1317, 1323 (1976) (Powell, J.); *Green Party of Georgia v.*

---

[6]The parties have not informed us of any challenges to the petition, which were due seven days after filing of the petition. *Id.*

No. 18-1992, *Graveline et al. v. Johnson et al.*

*Kemp*, 171 F. Supp. 3d at 1374 (entering a permanent injunction requiring 7,500 valid signatures on a petition in order to be "sensitive to the State's interests").

### III. CONCLUSION

For the reasons stated above, Defendants-Appellants' motion for a stay of the district court's preliminary injunction is **DENIED**.

13

No. 18-1992, *Graveline et al. v. Johnson et al.*

GRIFFIN, Circuit Judge, dissenting.

"A preliminary injunction is an extraordinary and drastic remedy, one that should only be awarded upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (internal citations and quotation marks omitted). Plaintiff Christopher Graveline has made no such showing. In my view, the district court abused its discretion in arbitrarily rewriting Michigan's reasonable election laws and in permitting an unqualified candidate to appear on the upcoming general-election ballot. I would grant defendants' motion to stay and therefore respectfully dissent.

We evaluate a motion to stay pending appeal using the same factors we consider in determining whether to issue a preliminary injunction: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 244 (6th Cir. 2006) (quotation omitted). While we must consider and balance these factors (and not treat them as prerequisites), the first factor—the likelihood of the party prevailing on the merits of the appeal—is of paramount importance. *Southern Glazer's*, 860 F.3d at 849. And we review the ultimate decision to grant an injunction for an abuse of discretion, reviewing legal conclusions de novo and fact findings for clear error. *Id.*

The first factor significantly favors defendants. In this as-applied challenge to Michigan's election laws, Graveline must satisfy three statutory requirements to be placed on the general election ballot as an independent candidate for Attorney General—he must 1) submit 30,000

14

No. 18-1992, *Graveline et al. v. Johnson et al.*

nominating signatures of registered voters; 2) have collected them within 180 days prior to July 19 (110 days before the election); and 3) have at least 100 signatures come from at least half of Michigan's congressional districts. M.C.L. §§ 168.590c(2), 168.544f, 168.590b(3)–(4). At issue in this appeal is the "combined effect" of the first and second requirements.[1] *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006).

During the last election in 2014, Michigan voters cast 3,077,164 ballots for attorney general. *See* 2014 Michigan Election Results, Michigan Secretary of State, https://miboecfr.nictusa.com/election/results/14GEN/. The statutory nominating signature requirement of 30,000 for independent candidates, M.C.L. 168.544f, is 0.97% of this total—less than 1%. The Supreme Court upheld a signature requirement five times as much in *Jenness v. Fortin*, 403 U.S. 431, 438 (1970) (5% signature requirement to be collected over a six-month period). Similarly, our court in *Lawrence v. Blackwell*, 430 F. 3d 368, 375 (6th Cir. 2005) (which applied *Jenness* post-*Anderson/Burdick*), held that Ohio's 1% signature requirement for independent candidates was reasonable and non-discriminatory. As we stated in *Lawrence*, "[t]he signature requirement meets Ohio's important state interest in verifying a candidate's support." *Id.* So too here.

The 180-day requirement for circulating petitions before July 19 also furthers Michigan's important state interest in its orderly administration of elections. Such an interest was upheld by

---

[1] Because Graveline obtained the needed signatures in the congressional districts, he does not contest this requirement, the district court's order enforces it, and the majority takes no issue with it.

15

No. 18-1992, *Graveline et al. v. Johnson et al.*

our court in *Lawrence*, *id.* at 373–74. Moreover, Graveline knew after the Democratic Party endorsement convention on April 15 that his democratic opponent Dana Nessel had been selected as the nominee for the upcoming party convention. Nonetheless, he intentionally waited until June 5 to start circulating his nominating petitions as an independent candidate—collecting nearly half the signatures required (14,157) in just under a quarter of the time permitted (42 days). Graveline's diligence while seeking signatures does not excuse his dilatoriness in waiting to begin the process; his lack of due diligence is apparent and should be considered as a factor in his unsuccessful effort to meet the 0.97% signature threshold. *See, e.g.*, *Storer v. Brown*, 415 U.S. 724, 742 (1974) (in assessing ballot access claims by independent candidates, the question is "could a *reasonably diligent* independent candidate be expected to satisfy the signature requirements") (emphasis added). Nor does his decision to see who the major parties would nominate excuse his delay. *See, e.g.*, *Lawrence*, 430 F.3d at 373–74 ("[T]he burden on independent candidates to file . . . before the primary is reasonable because it prevents such candidates from being able to make a decision to run for office after learning which candidates will be representing the major parties."). In addition, there is no record evidence supporting the majority's novel theory regarding the level of "political energy" of the Michigan electorate during the relevant time period. The majority's conjured fact to support its "severe burden" conclusion is just that.

This notwithstanding, the district court and the majority reason the sum of these restrictions is greater than the parts, focusing on one, and only one, piece of anecdotal evidence—that no independent candidate for statewide office has qualified for the ballot since Michigan adopted its

16

No. 18-1992, *Graveline et al. v. Johnson et al.*

current statutory scheme.[2]  Historical evidence, however, is "not conclusive in and of itself." *Libertarian Party*, 462 F.3d at 589.  Rather, "a historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality." *Id.* at 589–90 (citation omitted).  In my view, the mere absence of independent candidates, in and of itself, says little about the effect of these restrictions; for all we know, Graveline could be the first and only independent candidate to even attempt to qualify for the statewide ballot under Michigan's current scheme, and I am aware of no other similar challenges to these election laws.

Based on the record, I would hold the challenged state election laws are minimally burdensome, reasonable, nondiscriminatory, and justified by Michigan's regulatory interests.  *See generally Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016); *see also Jenness*, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support [before placing a] candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.").  The district court's order arbitrarily requires Graveline to be placed on the statewide ballot if he obtained 5,000 nominating signatures—less than 0.17% of the votes cast in the last election for attorney general.  The order is without a basis in law and contrary to precedent

---

[2] Contrary to the majority's assertion, the current scheme has been in place only since 1999, when Michigan adopted the population-based signature requirement. *See* 1999 P.A. 218 (Mich.).

17

No. 18-1992, *Graveline et al. v. Johnson et al.*

from the Supreme Court and our court. It judicially creates an unreasonably low threshold for ballot access for this independent candidate.[3]

Finally, the other factors also favor defendants. Absent a stay at this juncture, irreparable harm will occur to the State of Michigan, its public interest, and to the qualified candidates for Michigan Attorney General by the irreversible decision to place an unqualified candidate on the general election ballot who will garner votes from the qualified candidates. *See, e.g.*, *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Coal. to Defend Affirmative Action*, 473 F.3d at 252 ("[T]he public interest lies in a correct application of . . . statutory provisions, . . . and ultimately . . . upon the will of the people of Michigan being effected in accordance with Michigan law.").

---

[3] The district court in setting the arbitrary threshold of 5,000 signatures considered all fifty states as the same despite vast population differences. It concluded "that states that require 5,000 signatures for general election ballot access for independent candidates or new parties for statewide office will not have a crowded ballot [and that it] follow[s] that such states believe that this same signature requirement of not less than 5,000 signatures can satisfactorily demonstrate a sufficient level of community support for a candidates for statewide office in Michigan." Yet this accounts for raw numbers, not percentages, and results in absurd application depending upon a state's population. Consider California. 7,136,125 votes were registered for California's Attorney General election in 2014, and a showing of 5,000 signatures would be a miniscule 0.07% of the votes cast. Statement of Vote, November 4, 2014, General Election, California Secretary of State, https://elections.cdn.sos.ca.gov/sov/2014-general/pdf/2014-complete-sov.pdf.

18

No. 18-1992, *Graveline et al. v. Johnson et al.*

We do not know who the people of the State of Michigan will elect to be their Attorney General in November. However, in denying the motion to stay and allowing an unqualified candidate to appear on the ballot, the majority has forever tainted the election.

For these reasons, I respectfully dissent. I would grant defendants' motion to stay the order of the district court.

19