UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER GRAVELINE,
WILLARD H. JOHNSON, MICHAEL
LEIBSON, and KELLIE K. DEMING,

     Plaintiffs,

v

RUTH JOHNSON, Secretary of State of
Michigan, SALLY WILLIAMS, Director
of Michigan Bureau of Elections, in their
official capacities,

     Defendants.

No. 2:18-cv-12354

HON. VICTORIA A. ROBERTS

MAG. DAVID R. GRAND

**DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

_____

William P. Tedards, Jr.
Attorney for Plaintiffs
1101 30th Street, NW, Suite 500
Washington, DC  20007
202.797.9135

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659

_____/

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    Defendants  Secretary of State Jocelyn Benson and Director of Elections

Sally Williams, through their attorneys, Dana Nessel, Attorney General for the

State of Michigan and Heather Meingast and Erik A. Grill, Assistant Attorneys General for the State of Michigan, and in support of Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56, states as follows:

1.  Plaintiff Christopher Graveline filed as an independent candidate for state attorney general on June 4, 2018—42 days before the July 19, 2018 petition filing deadline.

2.  Plaintiff Graveline was unable to collect the minimum 30,000 signatures for his qualifying petitions before the July 19 deadline.

3.  Plaintiff Graveline and 3 of his supports filed this action challenging the constitutionality of the filing deadline, the signature requirement, and their "combined effect," which they allege to have infringed on their First and Fourteenth Amendment rights.

4.  Plaintiffs have subsequently abandoned their facial challenge and proceed only on their as-applied claims.

5.  The statutory filing deadline is part of a series of deadlines culminating in a federal law mandate that absent ballots be delivered to overseas and military voters no later than the 45th day before a general election.  In this case, that deadline was September 22, 2018.

6.  The 50-day window between the July 19 filing deadline and the September 7, 2018 ballot certification deadline is necessary to provide time to canvass the submitted petitions and resolve any potential legal challenges.

7.  The 30,000-signature requirement advances the state's interests in avoiding a confusing or overcrowded ballot, as well as discouraging frivolous or misleading candidates.

8.  The combined effect of these statutes does not severely burden independent candidates because they have 180 days in which to gather signatures, which is more than sufficient to collect that number of signatures.

9.  Even if the burden were severe, the state's election regulations are narrowly drawn to advance its important interests.

10. Plaintiffs have not met their burden to produce evidence that their inability to reach the 30,000 signature threshold was caused by any statutory disadvantage, as opposed to their only choice to delay starting the campaign until 42 days remained before the deadline.

11. Plaintiffs have not met their burden to show that the statutory scheme prevented other independent candidates from reaching the ballot.

12. There are no genuine issues of material fact, and Defendants are entitled to judgment as a matter of law.

13. Concurrence in the relief sought in this motion could not be obtained.

3

For these reasons and the reasons stated more fully in the accompanying brief in support, Defendants Secretary of State Jocelyn Benson and Director of Elections Sally Williams respectfully request that this Honorable Court enter an order dismissing Plaintiffs' complaint in its entirety and with prejudice, pursuant to Fed. R. Civ. P. 56, in addition to any other relief this court deems just and equitable under the circumstances.

Respectfully submitted,

s/Erik A. Grill
Erik A. Grill (P64713)
Heather S. Meingast (P55439)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  grille@michigan.gov
P64713

Dated:  August 15, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on August 15 2019, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

s/Erik A. Grill
Erik A. Grill (P64713)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  grille@michigan.gov
P64713

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER GRAVELINE,
WILLARD H. JOHNSON, MICHAEL
LEIBSON, and KELLIE K. DEMING,

No. 2:18-cv-12354

      Plaintiffs,

HON. VICTORIA A. ROBERTS

MAG. DAVID R. GRAND

v

JOCELYN BENSON, Secretary of State
of Michigan, SALLY WILLIAMS,
Director of Michigan Bureau of Elections,
in their official capacities,

      Defendants.

_____

William P. Tedards, Jr.
Attorney for Plaintiffs
1101 30th Street, NW, Suite 500
Washington, DC  20007
202.797.9135

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30217
Lansing, Michigan  48909
517.335.7659

_____/

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

Page

Table of Contents ...................................................................................... ii

Index of Authorities ................................................................................. iv

Concise Statement of Issues Presented ................................................... vii

Statement of Facts ......................................................................................1

    A.    Michigan Ballot Eligibility Requirements for Independent
           Candidates for Statewide Office. .........................................1

    B.    Plaintiff Christopher Graveline's Effort to Collect Signatures ............5

    C.    Expert Reports .........................................................................8

          1.    Plaintiffs' Expert – Richard Winger ...........................8

          2.    Defendants' Experts ...................................................9

          3.    Rebuttal Reports .......................................................11

    D.    Outcome of the 2018 General Election for Attorney General ...........13

Argument.....................................................................................................13

I.    The Court lacks subject-matter jurisdiction because this case no
    longer presents a live controversy and thus must be dismissed. ..................13

    A.    Plaintiffs' claims are moot. ................................................13

          1.    Effective relief can no longer be granted regarding the
               2018 General Election................................................14

          2.    The exception to the mootness doctrine does not apply. ..........15

    B.    Plaintiffs lack standing ......................................................19

II.    Plaintiffs have failed to show that the qualifying petition filing
    deadline, the 30,000 signature requirement, or the congressional

district signature requirement, or the combined effect of these laws, are unconstitutional under the First and Fourteenth Amendments. ..............21

    1.   The statutory scheme imposed a minimal burden on Graveline. ...................................................................................24

    2.   Plaintiffs have failed to meet their burden of production as to whether Michigan's laws prevent independent candidates from reaching the ballot. .........................................37

Conclusion and Relief Requested ............................................................38

Certificate of Service ..............................................................................39

# INDEX OF AUTHORITIES

Page

## Cases

*American Party of Texas v. White*, 415 U.S. 767 (1974)........................................25

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .........................................................22

*Burdick v. Takushi*, 504 U.S. 428 (1992)............................................................ 21, 22

*Church of Scientology v. United States,* 506 U.S. 9 (1992)....................................13

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008).................................22

*De La Fuente v. California*, 278 F. Supp. 3d 1145 (C.D. Cal., 2017)....................27

*DeFunis v. Odegaard*, 416 U.S. 312 (1974) ............................................................14

*Fed. Election Comm'n v. Wis. Right To Life, Inc.,* 551 U.S. 449 (2007) ................17

*Ford v. Wilder*, 469 F.3d 500 (6th Cir. 2006)................................................... 14, 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000).......19

*Green Party of Tenn. v. Hargett (Hargett I)*, 767 F.3d 533 (6th Cir. 2014) ...........23

*Green Party of Tenn. v. Hargett (Hargett II)*, 791 F.3d 684 (6th Cir. 2015) ..........22

*Hall v Secretary of State*, 902 F.3d 1294 (11th Cir. 2018).....................................18

*Hollingsworth v. Perry*, 570 U.S. 693 (2013)..........................................................20

*Honig v. Doe,* 484 U.S. 305 (1988) .........................................................................16

*Jenness v. Forton*, 403 U.S. 431 (1971) ..................................................................25

*Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005)............................... 16, 19, 26

*Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570 (6th Cir. 2016) ......... 24, 26

*Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th Cir. 2006) ...... 16, 37, 38

*Los Angeles County v. Davis,* 440 U.S. 625 (1979) ................................................13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................20

*McPherson v. Mich. High School Athletic Ass'n,* 119 F.3d 453 (6th Cir. 1997)........................................................................................................................13

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ........................ 20, 25

*Moore v. Ogilvie,* 394 U.S. 814 (1969) .......................................................16

*Mosely v. Hairson*, 920 F.2d 409 (6th Cir. 1990)............................................ 14, 15

*Munro v. Socialist Workers Party,* 479 U.S. 189 (1986)........................................25

*Murphy v Hunt*, 455 U.S. 478 (1982) ......................................................18

*Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329 (6th Cir. 2016) .........23

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) .............. 23, 36, 38

*Rosen v. Brown,* 970 F.2d 169 (6th Cir. 1992) .........................................................15

*Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498 (1911) .....................................15

*Storer v. Brown*, 415 U.S. 724 (1974) ................................................................. *passim*

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997)..............................26

*Weinstein v. Bradford,* 423 U.S. 147 (1975) ..................................................... 16, 17

## Statutes

Mich. Comp. Laws § 168.471........................................................................................30

Mich. Comp. Laws § 168.544f ............................................................................... 1, 25

Mich. Comp. Laws § 168.590b(4) .......................................................................... 1, 24

Mich. Comp. Laws § 168.590c(2) ..................................................................... 1, 3, 14

Mich. Comp. Laws § 168.648..........................................................................1, 3, 31

Mich. Comp. Laws § 168.689............................................................................................2

Mich. Comp. Laws § 168.712.............................................................................................3

Mich. Comp. Laws § 168.714..................................................................... 3, 29

Mich. Comp. Laws 168.590b(2)..................................................................25

Mich. Comp. Laws 759a..............................................................................3

## Constitutional Provisions

52 U.S.C. § 20302(a)(8)........................................................................ 3, 29

Const. 1963, Art. II, §4(1)(b)....................................................................31

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Whether the Court should dismiss this case for lack of subject-matter jurisdiction because the case no longer presents a live controversy.

2.    Whether the Court should dismiss this case because Plaintiffs have failed to show that the qualifying petition filing deadline, the 30,000 signature requirement, or the congressional district signature requirement, or the combined effect of these laws, are unconstitutional under the First and Fourteenth Amendments.

## STATEMENT OF FACTS

### A.      Michigan Ballot Eligibility Requirements for Independent Candidates for Statewide Office.

1.      All candidates for statewide office are required to comply with Michigan's Election Law, which includes signature gathering requirements and statutory deadlines.

2.      There are three ballot eligibility requirements for unaffiliated or independent candidates for statewide office that are challenged in this case:  (1) the 30,000 minimum signature requirement that candidates for statewide office without a political party affiliation must obtain, Mich. Comp. Laws § 168.544f, (2) the requirement that the 30,000 signatures include at least 100 registered voters in each of at least 1/2 of the congressional districts in the state, Mich. Comp. Laws § 168.590b(4); and (3) the filing deadline for qualifying petitions—the 110th day before the general election, Mich. Comp. Laws § 168.590c(2), which was July 19, 2018 for the November 2018 general election.  Those three requirements do not exist in a vacuum and are part of a larger election framework.

3.      The Secretary of State is required by law to certify the general election ballots to the state's 83 county clerks, and this certification must be completed no later than 60 days before the election, which in this case was September 7, 2018. Mich. Comp. Laws § 168.648.

4.     This certification includes the names of candidates for partisan and non-partisan offices who have qualified to appear on the ballot.  (Exhibit A, Affidavit of S. Williams, ¶4).

5.     The 83 Boards of County Election Commissioners are in turn responsible for preparing and printing ballots for the general election.  Mich. Comp. Laws § 168.689.  In the case of the November 2018 general election, the ballot preparation process began after the results of the August 7 primary election.  (Ex. A, ¶6).

6.     The persons responsible for programming, coding, and printing ballots were to begin no later than August 28, 2018, and some could begin as early as August 21, 2018.  (Ex. A, ¶6).

7.     The arrangement of the ballot is performed in such a way so that the names of state-wide candidates subsequently certified to the general election by the Board of State Canvassers—along with any ballot proposals—may be promptly programmed and printed.  (Ex. A, ¶6).

8.     In the November 2018 general election, the minimum number of ballots to be printed was 7.4 million. (Ex. A, ¶8).

9.     In addition, every county in the state produces multiple ballot styles, based on the geographic boundaries for the various elective offices that will appear on the ballot. (Ex. A, ¶12).  In total, the ballot preparation process can take up to 3 weeks.

(Ex. A, ¶14). The deadlines for ballot preparation are in part based upon the deadlines for actual delivery of the ballots.

10.    By law, absent voter ballots must be delivered to the Board of County Election Commissioners by the 47th day before the election, which was September 20, 2018 for the November 2018 general election. Mich. Comp. Laws § 168.712. (Ex. A, ¶15).

11.    And under state and federal law, absent voter ballots must be available to all voters—and especially to military and overseas voters—no later than the 45th day before the election, which was September 22, 2018 for the November 2018 general election. Mich. Comp. Laws §§ 168.714 and 759a; 52 U.S.C. § 20302(a)(8). (Ex. A, ¶15).

12.     In order for ballots to be delivered and available on time, the necessary work for preparation must be done in advance of that time.

13.    The 110th day filing deadline for independent candidates filing qualifying petitions occurs in the context of this ballot preparation and delivery process.

14.    The 110th day before the election filing deadline for qualifying petitions, Mich. Comp. Laws § 168.590c(2), and the 60th day before the election certification deadline, Mich. Comp. Laws § 168.648, creates a window of 50 days.

15.    Here, that window transpired between July 19, 2018 and September 7, 2018.

16.     Within the 50-day period, the Secretary of State was required to complete

the following tasks:

a.  Review every qualifying petition filed with the Secretary of State,
    including an examination of each petition sheet and signature, for
    facial defects that would render the sheet or signature invalid.  This
    also includes random selection of signatures for checks against the
    Qualified Voter File (QVF).  (Ex. A, ¶17b).  For Graveline's 15,000
    petition signatures, this process was estimated to require a minimum of
    4 business days.  (Ex. A, ¶22).  Canvassing the 30,000 statutorily
    required signatures would likely take longer.

b.  Accept any challenges against qualifying petitions submitted within 7
    days of the filing deadline (in the case of 2018, that deadline was July
    26, 2018).  (Ex. A, ¶17a; MCL 168.552(8); MCL 168.590f(1)).

c.  If a challenge is received, the Secretary must compare individual
    signatures to the QVF to ensure that the signer was registered to vote
    in the jurisdiction on the date of signing, and that the signature
    matches the QVF.  This is a more in-depth and time-consuming review
    of each individual signature. (Ex. A, ¶17c).

d.  Also, in the event of a challenge, the Board of State Canvassers must
    convene a meeting to hold on hearing on the complaint.  (MCL
    168.552(9); Ex. A, ¶17c).  At least 2 business days before that
    meeting, the board must release its staff report concerning the
    challenges filed against the petition.  (MCL 168.552(10); Ex. A, ¶17c).

e.  Complete any legal challenges to the Board's determination on any
    challenges filed against qualifying petitions before the deadline for
    Secretary of State certification (in 2018, the September 7 deadline).

f.  Determine that any candidates who have filed qualifying petitions have
    submitted a sufficient number of valid signatures to warrant
    certification to the general election ballot.  (Ex. A, ¶17d).

17.     This must all occur within the 50 days between the 110th and 60th days

before the date of the general election.

18.     This process is identical to the canvass process used for candidates who file nominating petitions to run as party-affiliated candidates, except that the party affiliated candidate canvasses must be completed in 45 days instead of 50. (Ex. A, ¶18).

19.     Although independent candidacies for *statewide* office have historically been uncommon, there is no guarantee that will always be so, and the above process would apply to every such candidate regardless how many run in the same election.

20.     In the November 2018 general election, there were *four* congressional candidates without a party affiliation who submitted qualifying petitions and were certified to appear on the general election ballot.  (Ex. A, ¶20).

21.     If a similar number of independent candidates sought qualification for a statewide office, it would require the canvassing of over 120,000 signatures in the same 50-day window.

    **B.     Plaintiff Christopher Graveline's Effort to Collect Signatures**

22.     On or about June 4, 2018, Plaintiff Graveline filed a statement of organization to become a candidate for the office of Attorney General with no political party affiliation.  (Exhibit B, printout of https://cfrsearch.nictusa.com/committees/ 518994 (last accessed on August 12,

2019; R. 1-3, Complaint, Exhibit B, Declaration of C. Graveline, ¶9, Page ID #
33.)

23.     However, Graveline admitted that he had been considering running for that
office after the Democratic Party's early endorsement convention on April 15,
2018, at which time the Party gave its endorsement to current Attorney General
Dana Nessel.  (R.1-3, ¶2-3, Page ID #29-30).

24.     Graveline was also aware that the two announced candidates for the
Republican nomination for Attorney General were then-House Speaker Tom
Leonard and State Senator Tonya Schuitmaker, although the formal nomination
would not take place until August 25, 2018.  (R.1-3, ¶4, Page ID #31).

25.     The Republican nomination ultimately went to Mr. Leonard.  (Exhibit C,
printout of https://mielections.us/election/results/2018GEN_CENR.html (last
accessed August 12, 2019)).

26.     Nonetheless, even before the Democratic or Republican nominees had been
officially chosen, Graveline did not favor any of the potential candidates, finding
them to be excessively partisan.  (R.1-3, ¶3-4, Page ID #29-31).

27.     Graveline attested that he began to "seriously consider" running in "early
May" of 2018.  (R.1-3, ¶8, Page ID #32-33).

28.    But he did not start collecting signatures until June 7, 2018—three days after launching his campaign.  By that time, only 42 days remained until the July 19, 2018 filing deadline for qualifying petitions.  (R.1-3, ¶9, Page ID # 33).

29.    Notwithstanding Graveline's self-imposed late start, his campaign volunteers collected 7,899 signatures.  (R.1-3, ¶11, Page ID # 34).

30.    Graveline also retained the services of a professional signature-gathering firm, who collected over 6,000 more signatures, for an approximate total of 14,157. (R.1-3, ¶13-15, Page ID #35).

31.    This total is slightly less than half the 30,000 minimum number of signatures required for ballot eligibility under § 544f.

32.    Graveline's reason for having only 42 days instead of the full 180-day signature-gathering period provided for by Mich. Comp. Laws § 168.590b(3), was not the result of any statutory restriction or deadline—instead, Graveline admitted that it was because his decision to run began with his dissatisfaction with the presumptive Democratic nominee, who received her party's endorsement on April 15.  (R.1-3, ¶10, Page ID # 34).

33.    Graveline also admitted that the fact that he would have to resign from his position at the U.S. Attorneys Office under the federal Hatch Act played a role in delaying his decision to file as a candidate.  (R. 1-3, ¶ 8, Page ID #32).

C.      **Expert Reports**

1.      **Plaintiffs' Expert – Richard Winger**

34.    Mr. Winger is the editor of Ballot Access News, a printed publication that, "covers changes in ballot access laws that affect minor political parties and independent candidates."  (Exhibit D, Winger Report, 12/14/2018, p 1).

35.    Mr. Winger opines that, "the experience of all 50 states, since the beginning of government printed ballots, shows that a very small petition requirement is sufficient to keep frivolous candidates from getting on the ballot and causing ballots to be overcrowded."  (Ex. D, p 3).

36.    This conclusion is apparently founded on Mr. Winger's "fifty years of research," in which he has "collected returns from all states for all statewide general elections since the beginning of government printed ballots," and "studied the history of each state's ballot access laws, from their beginning."  (Ex. D, p 3).

37.    Mr. Winger concludes that "any state that required more than 5,000 signatures for general election ballot access for independent candidates for statewide office, and among the states that require *exactly* 5,000 signatures, only Ohio 1976 had more than eight candidates, that was nine candidates for president." (Ex. D, p 3).

38.    Mr. Winger also opines that Michigan could adopt a later filing deadline "in August or September," which he believes would still allow it sufficient time to prepare and print ballots and mail absentee ballots.  (Ex. D, p 4).

### 2.    Defendants' Experts

### a.    Lee Albright

39.    Lee Albright is the president of National Petition Management, and has experience gathering signatures for petition efforts nationwide since 1988. (Exhibit E, Albright CV, Page 1-6).

40.    Included in his experience are almost twenty statewide petition efforts in Michigan.  *Id.*

41.    Mr. Albright describes several petition-gathering scenarios that may apply to an independent candidate qualifying for the ballot under Michigan law.  (Exhibit F, Albright Report 2/26/2019, p 1).

42.    Of note, Mr. Albright states that using 179 of the 180 days provided by law, the effort to gather 30,000 valid signatures requires collecting only 224 signatures per day depending on the weather and available venues for gathering.  (Ex. F, p 1).

43.    If a candidate reduces the number of days to collect signatures, it increases the number of signatures needed per day.  (Ex. F, p 2).

44.    In Mr. Albright's experience, it is easier to gather signatures in the early part of an effort and becomes more difficult later in the process.  (Ex. F, p 2).

45.    Mr. Albright also stated that, in his opinion, had Plaintiff Graveline used the

full 180 days allotted by statute, his costs per signature would have been lower.

(Ex. F, p 3).

46.    According to Mr. Albright, "gathering 30,000 valid signatures of qualified

Michigan voters within the 180 days allowed can most certainly be done."  (Ex. F,

p 3).

### b.    Dr. Colleen Kelly

47.    Dr. Colleen Kelly is a tenured professor of statistics at San Diego

University, and a consultant with expertise in statistical analysis.  (Exhibit G, Kelly

Report 2/28/2019, p 11).  Dr. Kelly rebuts Plaintiffs' expert Mr. Winger in several

ways:

   a.  Mr. Winger's analysis is not a statistical or mathematical analysis of
       data, and his conclusion that 5,000 signatures are sufficient is not
       supported with any logical justification.  (Ex. G, p 4, 8).
   b.  To make a conclusion about the effect of instituting a 5,000 signature
       requirement, data from states with that requirement should be
       considered.  (Ex. G, p 4).
   c.  Mr. Winger does not include analysis of the number of candidates on
       the ballot that would lead to voter confusion.  (Ex. G, p 4).  Winger
       offered no evidence to support his claim that a limit of 8 candidates
       would avoid voter confusion, except from a statement from Justice
       John Harlan in his concurring opinion in *Williams v. Rhodes*, 393 U.S.
       23 (1968) that he did not believe that as many as 8 would cause
       confusion.  (Ex. G, p 8).

48.    Dr. Kelly correlated signature requirements for independent candidates for

President and a number of candidates on the ballot using data from 2000 to 2016

from all 51 states (255 data points in total) to estimate the effects of a 5,000 signature requirement on Michigan's ballot.  (Ex. G, p 4).

49.     Comparing the absolute number of signatures required across 46 states (5 states do not elect attorneys general) as well as the required number of signatures as a percentage of the total state population, Dr. Kelly found that Michigan's 30,000 signature requirement was not unusual.  (Ex. G, p 4-5).

50.     In terms of absolute number of signatures, Michigan's 30,000 signature requirement is in the 87th percentile, but is in the 67th percentile when viewed as a percentage of the state population.  (Ex. G, p 4-5).

51.     Dr. Kelly also conducted a statistical analysis that determined that lowering the signature requirement to 5,000 signatures could result in up to 11 candidates on the ballot for one office per year.  (Ex. G, p 9).

### 3.     Rebuttal Reports

#### a.     Winger Rebuttal April 15, 2019

52.     Mr. Winger took exception to Dr. Kelly's conclusion that there was "no logical justification" for a 5,000 signature requirement being sufficient to protect against overcrowding ballots.  (Ex. H, Winger Rebuttal 4/15/2018, p 1).

53.     Winger notes a factual error in Dr. Kelly's report, where she stated that there were three instances when Florida required more than 5,000 signatures and there were more than 8 candidates on the ballot.  (Ex. H, p 1).

11

54.    Mr. Winger points out that Florida did not have a signature requirement for minor political parties from 1999 to 2016.

55.    Mr. Winger then re-iterated his historical analysis as justification for his 5,000 signature threshold.  (Ex. H, p 1).

### b.    Dr. Kelly's Rebuttal to Winger's 4/15/2019 Report

56.    In response to Mr. Winger's rebuttal, Dr. Kelly stated that the error concerning Florida's election was not significant, and the change to those four single data points does not substantially change her statistical analysis or conclusions.  (Exhibit I, Kelly Rebuttal, May 15, 2019, p 1).

57.    Her revised analysis still predicts that, according to Mr. Winger's definition of crowded as being 9 or more candidates, Michigan's ballot would be crowded 13% of the time if the requirement were dropped to 5,000 signatures.  (Ex. I, p 1-2).

58.    Further, Dr. Kelly found that Mr. Winger's opinion does not consider the specific signature requirements of each state, and instead groups together all states requiring at least 5,000 signatures.  But that group includes a wide range of requirements, ranging from 5,000 to 194,118. (Ex. I, p 1).

59.    As a result, "it is no wonder that he concludes a 5,000 signature requirement can be substituted for a 30,000 signature requirement."  (Ex. I, p 1).

### D.    Outcome of the 2018 General Election for Attorney General

60.    In the November 2018 general election, the total number of votes for

Attorney General among all candidates was 4,184,026.  (Ex. C).

61.    Dana Nessel was the prevailing candidate with 2,031,117 votes.  (Ex. C).

62.    Tom Leonard placed second with 1,916,117 votes. (Ex. C).

63.    Libertarian candidate Lisa Lane Gioia earned 86,807 votes.  (Ex. C).

64.    Plaintiff Graveline received 69,889 votes, or 1.69% of all votes for Attorney

General.  (Ex. C).

## ARGUMENT

### I.    The Court lacks subject-matter jurisdiction because this case no longer presents a live controversy and thus must be dismissed.

#### A.    Plaintiffs' claims are moot.

This Court has a duty to determine whether the completion of the November

2018 general election deprives this Court of jurisdiction.  In general, a federal court

has a continuing duty to ensure that it adjudicates only genuine disputes between

adverse parties, where the relief requested would have a real impact on the legal

interests of those parties.  *See Church of Scientology v. United States,* 506 U.S. 9,

12 (1992); *McPherson v. Mich. High School Athletic Ass'n,* 119 F.3d 453, 458 (6th

Cir. 1997) (en banc).  If "the issues presented are no longer live or the parties lack

a legally cognizable interest in the outcome," then the case is moot and the court

has no jurisdiction. *Los Angeles County v. Davis,* 440 U.S. 625, 631 (1979).  A

13

"live" controversy is one that "persists in 'definite and concrete' form even after intervening events have made some change in the parties' circumstances." *Mosely v. Hairson*, 920 F.2d 409, 414 (6th Cir. 1990) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974)); *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) ("The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties.") (internal quotation marks and citation omitted).

### 1. Effective relief can no longer be granted regarding the 2018 General Election.

Here, Plaintiffs alleged that § 590c(2) (the filing deadline) was facially unconstitutional, and that the combined effect of § 544f (the 30,000 signature requirement), § 590b(4) (congressional district signature requirement) and § 590c(2), as applied to Plaintiffs, violated their constitutional rights by resulting in the exclusion of Plaintiff Graveline from the November 6, 2018, general election ballot.[1] (Doc. 1, Page ID 15-16, ¶¶ 33-44). They sought a declaration that these statutes were unconstitutional as applied and an "order placing Plaintiff Graveline on the ballot as a no party affiliation candidate for Attorney General in the upcoming November 2018 election[.]" *Id.*, Page ID 17. This Court made a

---

[1] Plaintiffs dropped their facial challenge to § 590c(2) at the preliminary injunction hearing, and Plaintiffs' counsel has confirmed that they are no longer pursuing the facial claim.

preliminary finding that the statutes in combination were applied unconstitutionally to Plaintiffs and entered an injunction ordering Plaintiff Graveline placed on the November 2018 general election ballot so long as he had obtained at least 5,000 valid signatures, (Doc. 12, Opinion & Order), which he did.  Plaintiffs thus had the opportunity to cast their ballot for him at that election as they requested.  Because Plaintiffs received all the practical relief they were seeking – placement on the ballot and an opportunity to vote for Plaintiff Graveline in the November 2018 general election – a declaration now that the statutes as applied to Plaintiffs was unconstitutional would not make a difference to the legal interests of the parties. *Ford*, 469 F.3d at 504.  Accordingly, there is no "live" controversy remaining as to Plaintiffs' claims post the November 2018 general election.  *Mosely*, 920 F.2d at 414.  Plaintiffs' claims are now moot and should be dismissed.

### 2.    The exception to the mootness doctrine does not apply.

An exception to the mootness doctrine exists for wrongs that are "capable of repetition, yet evading review."  *See Rosen v. Brown,* 970 F.2d 169, 173 (6th Cir. 1992) (quoting *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 514 (1911)). "[T]he 'capable of repetition, yet evading review' doctrine [i]s limited to the situation where two elements combine[ ]: (1) the challenged action [i]s in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party w[ill] be

15

subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975) (per curiam); *Honig v. Doe,* 484 U.S. 305, 318-19 n. 6 (1988). "The 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." *Storer v. Brown*, 415 U.S. 724, 737 n.8 (1974). "The party asserting that this exception applies bears the burden of establishing both prongs." *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005).

### a.     The challenged action was not fully litigated before the November 2018 election.

Courts have recognized that legal disputes involving election laws almost always take more time to resolve than the election cycle permits. *See Moore v. Ogilvie,* 394 U.S. 814, 816 (1969); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006); *Lawrence,* 430 F.3d at 371. Here, Plaintiffs' complaint was filed in July 2018 after his insufficient petition was rejected, the deadline for finalizing ballots was in September, and the election was held in November 2018, all before the case could be fully resolved on the merits. Whether the same result would occur in the future is speculative. But even if Plaintiffs satisfy this prong of the inquiry, they cannot fulfill their burden as to the second.

16

### b.      There is no reasonable expectation that the controversy will recur as to Plaintiffs.

Again, under the second prong, Plaintiffs must show that there is a "reasonable expectation" or "demonstrated probability" that the alleged controversy will recur as to Plaintiffs.  *See Weinstein,* 423 U.S. at 149.  In *Federal Election Comm v. Wisconsin Right To Life, Inc.*, the U.S. Supreme Court observed that "[o]ur cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it 'will again be subjected to the alleged illegality,' or 'will be subject to the threat of prosecution' under the challenged law."  *Fed. Election Comm'n v. Wis. Right To Life, Inc.,* 551 U.S. 449, 463 (2007) (internal citations omitted).  To meet this burden, a party need not show "repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail[.]"  *Id.* (citation omitted).  Rather, a party must show that "materially similar" circumstances will recur.  *Id.* at 464.  In that case, the U.S. Supreme Court concluded that Wisconsin Right To Life, Inc. "credibly claimed that it planned on running ' "materially similar" ' future targeted broadcast ads mentioning a candidate within the blackout period[.]"  *Id.* (citations omitted).

Presumably, Plaintiff Graveline will argue that he may want to run again for Attorney General or another statewide office as an unaffiliated candidate in November of 2022.  And the other Plaintiffs will argue that they may want to have the opportunity to cast votes for him in the future or perhaps for another

17

unaffiliated candidate for statewide office but will be denied the opportunity to do so because of the challenged statutes.  But there is nothing in the record that demonstrates it is probable, reasonable, or even credible, to expect that in four (or more) years Plaintiff Graveline will again spontaneously decide to run as an independent candidate for statewide office, wait to collect signatures until half the time period had run, and then fail to collect sufficient signatures in his effort to qualify for the ballot.  Or likewise, that an unknown future independent candidate will encounter the same fate.

It is theoretically possible that Plaintiff Graveline or another candidate may do so, but it is not "reasonable" under the present circumstances to expect that this will occur.  *Murphy v Hunt*, 455 U.S. 478, 482 (1982) (per curiam) ("The Court has never held that a mere physical or theoretical possibility was sufficient to satisfy the [capable-of-repetition] test[.]").  *See also Hall v Secretary of State*, 902 F.3d 1294, 1298 (11th Cir. 2018) ("reasonable expectation requires more than a theoretical possibility").  Rather, the reasonable expectation should be that, having gone through the experience once and failed, Plaintiff Graveline would launch a timely and organized signature-gathering campaign should he decide to run again for statewide office.

As for some unidentified, independent candidate that Plaintiffs might want to vote for at a future election, it would be pure speculation to conclude that

materially similar circumstances will occur as to that candidate. *Wis. Right To Life, Inc.,* 551 U.S. at 464. In other words, that this future candidate will decide late to become a candidate and ultimately fail to collect sufficient signatures. Those facts are material to Plaintiffs' as-applied claims.

Defendants recognize that the Sixth Circuit has applied a more "relaxed" approach in analyzing the capable-of-repetition prong in election cases, and that the decision in *Lawrence v. Blackwell* would suggest that the present case is not moot. 430 F.3d at 371-72. But *Lawrence* was decided before the Supreme Court's 2007 decision in *Wisconsin Right to Life, Inc.*, which was also an elections case. In *Wisconsin Right To Life, Inc.,* the Court reconfirmed that the inquiry is whether the *same* plaintiffs will be personally re-exposed to the challenged illegality, and that with respect to as-applied claims, the plaintiffs must credibly claim that the future controversy will be "materially similar" to the former controversy. Plaintiffs have not met this burden here. Plaintiffs' claims are moot.

**B.    Plaintiffs lack standing**

Even if Plaintiffs' claims are not moot, Plaintiffs lack standing to maintain their claims for declaratory relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180 (2000) ("Art. III, § 2, underpins both our standing and our mootness jurisprudence, but the two inquiries differ in respects"). To establish Article III standing, a party's injury must be "concrete, particularized,

and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149-150 (2010). And "Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citation omitted). It is Plaintiffs' burden to establish they have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Here, Plaintiffs arguably had standing as of the initial filing of this case; they had an actual injury (denial of access to the 2018 ballot/denial of opportunity to vote for candidate of choice in 2018, which implicated their First and Fourteenth Amendment rights) that was traceable to the challenged action (the Secretary's rejection of the qualifying petition as insufficient as of the filing deadline) that would have been, and in fact was, redressed by a favorable ruling (the Court's granting of preliminary injunctive relief placing Plaintiff Graveline on the November 2018 ballot).

Plaintiffs no longer have an actual injury. Now, they can only speculate as to an injury at some election in the future. But a future injury must be "imminent" to support standing. *Monsanto Co.,* 561 U.S. at 149-150. The Supreme Court has explained that:

> "Although imminence is concededly a somewhat elastic concept, it
> cannot be stretched beyond its purpose, which is to ensure that the
> alleged injury is not too speculative for Article III purposes—that the
> injury is *certainly* impending." Thus, we have repeatedly reiterated

that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of possible future injury" are not sufficient. [*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citations omitted) (emphasis in original).]

As discussed above with respect to mootness, the threated injury with respect to Plaintiff Graveline is that he may decide late to run again for Attorney General or another statewide office in 2022, thereby reducing his signature circulation window and that he will again fail to collect sufficient signatures within the remaining window by the filing deadline.  There are too many variables in this scenario for him to demonstrate that this "threatened injury" is "certainly impending."  *Clapper*, 568 U.S. at 409.  The same is true with respect to the other Plaintiffs whose threatened injury is simply that they may wish to vote for Plaintiff Graveline or for another independent candidate in the future, who apparently will encounter problems similar to Graveline and not qualify for the ballot.  Under these circumstances, Plaintiffs cannot show a sufficiently imminent injury in order to demonstrate they have standing to sue.  Their claims must be dismissed for this reason as well.

## II.   Plaintiffs have failed to show that the qualifying petition filing deadline, the 30,000 signature requirement, or the congressional district signature requirement, or the combined effect of these laws, are unconstitutional under the First and Fourteenth Amendments.

The "right to vote in any manner . . . [is not] absolute," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted); the Constitution recognizes the states'

clear prerogative to prescribe time, place, and manner restrictions for holding

elections. U.S. Const. art. I, § 4, cl. 1. Indeed, there "must be a substantial

regulation of elections if they are to be fair and honest and if some sort of order,

rather than chaos, is to accompany the democratic processes." *Burdick*, 504 U.S.

at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Federal law thus

generally defers to the states' authority to regulate the right to vote. *See Crawford*

*v. Marion Cty. Election Bd.*, 553 U.S. 181, 203-04 (2008) (Stevens, J., op.)

(recognizing that neutral, nondiscriminatory regulation will not be lightly struck

down, despite partisan motivations in some lawmakers, so as to avoid frustrating

the intent of the people's elected representatives).

When a constitutional challenge to an election regulation requires courts to

resolve a dispute concerning these competing interests, courts apply the *Anderson-*

*Burdick* analysis from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick*

*v. Takushi*, *supra*, which requires the following considerations:

> [T]he court must first consider the character and magnitude of the
> asserted injury to the rights protected by the [Constitution] that the
> plaintiff seeks to vindicate. Second, it must identify and evaluate the
> precise interests put forward by the State as justifications for the
> burden imposed by its rule. Finally, it must determine the legitimacy
> and strength of each of those interests and consider the extent to
> which those interests make it necessary to burden the plaintiff's rights.

*Green Party of Tenn. v. Hargett (Hargett II)*, 791 F.3d 684, 693 (6th Cir.

2015)(internal quotation marks and citations omitted). "Though the touchstone of

22

*Anderson-Burdick* is its flexibility in weighing competing interests, the
'rigorousness of [the court's] inquiry into the propriety of a state election law
depends upon the extent to which a challenged regulation burdens First and
Fourteenth Amendment rights.' " *Ohio Democratic Party v. Husted*, 834 F.3d 620,
627 (6th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434).

If a state imposes "severe restrictions" on a plaintiff's constitutional right to
vote, its regulations survive only if "narrowly drawn to advance a state interest of
compelling importance." *Burdick*, 504 U.S. at 434.  But "minimally burdensome
and nondiscriminatory" regulations are subject to a "less-searching examination
closer to rational basis" and "'the State's important regulatory interests are
generally sufficient to justify the restrictions.'" *Ohio Council 8 Am. Fed'n of State
v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016) (citing *Green Party of Tenn. v.
Hargett (Hargett I)*, 767 F.3d 533, 546 (6th Cir. 2014), and quoting *Burdick*, 504
U.S. at 434).  Regulations falling somewhere in between—"i.e., regulations that
impose a more-than-minimal but less-than-severe burden—require a 'flexible'
analysis, 'weighing the burden on the plaintiffs against the state's asserted interest
and chosen means of pursuing it.' " *Ohio Democratic Party*, 834 F.3d at 627
(quoting *Hargett I*, 767 F.3d at 546).

### 1. The statutory scheme imposed a minimal burden on Graveline.

The combined effect of Michigan's statutory scheme does not impose more than a minimal burden on independent candidates, justifying the "less searching" analysis more akin to rational basis. *Husted*, 814 F.3d at 335. Plaintiffs have not carried their burden to explain how the filing deadline and signature requirement amplify or aggravate one another. Neither of the statutes creates more than a minimal burden when considering Graveline's motivations and timing for entering the race and his ability to follow the law. For clarity, the statutes will be discussed individually before their combined effects are analyzed.

### a. Mich. Comp. Laws § 168.590b(4).

Section 590b(4) required Graveline to obtain at least 100 signatures from registered electors in at least half (7 of the 14) congressional districts in Michigan. Thus, of the 30,000 required signatures at least 700 must come from at least 7 of the congressional districts. This geographic distribution requirement serves the state's interest by requiring statewide candidates to show a modicum of support from voters within roughly half the state. See, e.g., *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016) (recognizing state interest in requiring candidates to demonstrate significant modicum of support for placement on the ballot). Graveline concedes that he met the requirement by obtaining at least 100 signatures from 12 of the 14 districts. (Compl., ¶ 25, Page ID 12).

Indeed, this Court ordered that Graveline comply with this requirement in order to be placed on the ballot.  (R. 12, Opinion & Order, p 25, Page ID # 169).  This Court therefore believed, and Defendants agree, that Graveline and the other Plaintiffs were not at all burdened by the application of this statute.  Moreover, since Plaintiffs suffered no actual injury from the application of § 590b(4), and thus there is no certainty of an imminent future injury, they do not have standing to challenge its constitutionality as applied to them.  *Monsanto Co.,* 561 U.S. at 149-150; *Clapper*, 568 U.S. at 409.

### b.    Mich. Comp. Laws § 168.544f.

Under § 544f Graveline was required to file at least 30,000 valid petition signatures.[2]  The Supreme Court has consistently recognized that states, like Michigan, have an important interest in requiring some preliminary showing of a significant modicum of support before printing the name of a candidate on the ballot; this protects the integrity of the electoral process by regulating the number of candidates on the ballot and avoiding voter confusion.  *See Jenness v. Forton*, 403 U.S. 431, 441 (1971); *American Party of Texas v. White*, 415 U.S. 767, 783 (1974); *Munro v. Socialist Workers Party,* 479 U.S. 189, 194 (1986); *Timmons v.*

---

[2] Before § 544f's enactment in 1999, independent candidates were required to obtain signatures from not less than 1% of the total number of votes cast for all candidates for governor in the last election.  See 1988 PA 116; Mich. Comp. Laws 168.590b(2).

*Twin Cities Area New Party*, 520 U.S. 351, 367 (1997).  The Sixth Circuit has

likewise recognized that states have "an important interest in ensuring that

candidates demonstrate a 'significant modicum of support,' before gaining access

to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and

frivolous candidacies."  *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570,

577 (6th Cir. 2016).  Section 544f advances that important interest in Michigan by

requiring unaffiliated candidates, who lack the support and interest of a major or

even minor party, to demonstrate they have a significant modicum of public

support for their candidacy.

     As for the number of signatures required, Defendants do not dispute that

many other states apparently have lower requirements for the absolute number of

signatures required for independent candidates seeking to run for a statewide

office.  But it is also true, as noted by Plaintiffs' expert, that there are at least five

states with higher signature requirements than Michigan:  Alabama, Arizona,

Georgia, North Carolina, and Texas.  (Ex. D, p 3).  Further, Defendants' Expert Dr.

Kelly found that Michigan's requirement is in the 67th percentile as a percentage

of the state population.  (Ex. G, p 4-5).  Simply put, Michigan's signature

requirement is neither unusual for the size of its population, nor unreasonable.

     In *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005), the Sixth

Circuit held that Ohio's one-percent signature requirement for independent

candidates was reasonable and nondiscriminatory.  As the Court stated, "[t]he

signature requirement meets Ohio's important state interest in verifying a

candidate's support."  *Id*.   In comparison, Michigan's 30,000 signature figure is

less than 1% of the 3,077,164 votes cast for Attorney General in 2014,[3] and of the

4,184,026 votes cast for Attorney General in 2018.  (Ex. C).

Similarly, in *De La Fuente v. California*, 278 F. Supp. 3d 1145, 1155 (C.D.

Cal., 2017), the District Court found that California's requirement that independent

candidates for president obtain signatures from one percent of the electorate was

not objectively unreasonable and was not a severe burden on independent

candidates.  Notably, that Court dismissed Mr. Winger's suggestion in that case

that a 5,000 signature requirement was sufficient, finding that the plaintiff's

reliance on Winger's opinion was not sufficient to overcome the state's interests.

*Id*. at 1156.  Again, in comparison, Michigan's 30,000 signature figure is less than

1% of the total votes cast for Attorney General in the last two election cycles.

In addition, numerous federal courts have upheld similar signature

requirements for minor party candidates, similarly situated in many respects to

independent candidates.  (R. 8, Defs' Resp. to PI, Page ID ## 111-117).  *See also*

---

[3] *See* 2014 Michigan Election Results, Michigan Secretary of State,
https://mielections.us/election/results/14GEN/.

*Storer v. Brown*, 415 U.S. 724, 740 (1974) (upholding California's petition requirements for independent candidates).

The burden associated with the number of signatures required is mitigated by the lengthy circulation period permitted.  By law, independent candidates, including Graveline, have 180 days (six months) in which to circulate a qualifying petition and obtain the required 30,000 signatures. *See* Mich. Comp. Laws § 168.590b(3).  The ability of independent candidates to reach the 30,000 signature requirement is supported by the expert opinion of Lee Albright, who has conducted numerous statewide petition efforts in Michigan.  (Ex. E, F).  According to Mr. Albright, "gathering 30,000 valid signatures of qualified Michigan voters within the 180 days allowed can most certainly be done."  (Ex. F, p 3).

Indeed, in 42 days Graveline collected 14,157 signatures, 7,899 of which were collected by his unpaid volunteers.  (R. 1-3, Page ID # 33, ¶ 9).  Just based on simple math, 14,157 signatures over 42 days translates into a rate of 337 signatures per day.  If Plaintiffs' volunteers and paid circulators had circulated for 180 days at that rate, they would have collected over 60,000 signatures, satisfying the 30,000 signature requirement and, in fact, reaching the maximum number of signatures that are allowed to be submitted.

### c.   Mich. Comp. Laws § 168.590c(2).

Finally, § 590c(2) required Plaintiff Graveline to file his qualifying petition

by the 110th day before the November general election, which again was July 19,

2018.  As noted above, states have the power to prescribe time, place, and manner

restrictions for holding elections, and there "must be a substantial regulation of

elections if they are to be fair and honest and if some sort of order, rather than

chaos, is to accompany the democratic processes." *Burdick*, 504 U.S. at 433

(quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  Here, the filing deadline is

not arbitrary or designed to short-change independent candidates like Graveline; it

is part of a carefully constructed set of election deadlines extending backwards

from the date of the election.

The affidavit of Sally Williams, Director of Elections, demonstrates that the

filing deadline is part of a chain of deadlines culminating in the 45th-day deadline

for having ballots available to absent voters.  (Ex. A, ¶15, citing Mich. Comp.

Laws §§ 168.714 and 759a; 52 U.S.C. § 20302(a)(8); see also Ex. J, 2018

Michigan Election Dates).  As discussed above, another critical deadline is the

deadline for certifying candidates to the local election officials, which is the 60th

day before the November general election, in this case September 7, 2018.  The

110th day filing deadline and the 60th day certification deadline create a window

of 50 days within which the Secretary of State must canvass all qualifying petitions

filed for statewide offices to determine whether the required number of signatures have been collected. This window also permits time for interested third parties to challenge a petition, and for the Secretary of State to process such challenges. In addition to qualifying petitions, during this window the Secretary of State may also be canvassing petitions proposing constitutional amendments, which require several hundred thousand signatures. *See* Mich. Comp. Laws § 168.471 (deadline for filing petitions to amend the constitution is 120th day before the election at which the proposal will be voted upon).

Any extension of the filing deadline for qualifying petitions would obviously encroach upon the 50-day window, thereby reducing the time for the Secretary of State to perform her duties with respect to such petitions, and potentially interfering with the performance of her other duties during the same time period. Other than complain that the filing deadline should be later, Plaintiffs have not proffered what the deadline should be or explained how a later deadline will not detrimentally impact the Secretary of State's processes.

Plaintiffs' expert, Mr. Winger, does not explain how Michigan could implement a filing deadline in August or September and still comply with the certification deadline and other deadlines, like the requirement that absent voter ballots must be available to voters no later than 45 days before a November election. This 45-day requirement was recently adopted into the state constitution.

Const. 1963, Art. II, §4(1)(b).  Instead, he points to other states that have a later filing deadline but offers no analysis or comparison to their ballot preparation procedures, the structure of their election system, or the specific deadlines each state uses.  While Mr. Winger may have a general knowledge of election laws throughout the nation, Ms. Williams has the greater expertise in conducting elections in Michigan.

Her affidavit demonstrates that § 590c(2)'s filing deadline is another necessary cog in Michigan's election machinery that keeps the process running in an orderly manner.  The Sixth Circuit has recognized that "easing administrative burdens" on elections officials is "undoubtedly '[an] important regulatory interest[ ].' " *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (citation omitted).  The filing deadline advances that important regulatory interest by ensuring that the Secretary of State and her staff have sufficient time to canvass qualifying petitions to meet the 60th day before the election deadline for certifying candidates under Mich. Comp. Laws § 168.648, which triggers final preparations for ballot printing by the counties.

> **d.  The statutes, as applied, had no "combined effect" resulting in the unconstitutional treatment of Plaintiffs.**

To be clear, Plaintiffs are not alleging each statute created an unconstitutional burden as to them.  In other words, the statutes are constitutional

in their own right.  Rather, Plaintiffs allege it is the "combined effect" of the statutes that created an unconstitutional burden on their First and Fourteenth Amendment associational rights.  *See, e.g*, *Libertarian Party*, 462 F.2d at 586. Setting aside the geographical-distribution requirement of § 590b(4), which Graveline satisfied, the two statutes at issue prescribed (1) the 30,000-signature requirement, § 544f, and (2) the July 19, 2018 filing deadline,§ 590c(2).  The allegedly unconstitutional "combined effect" of these statutes arose when Graveline made his late decision to enter the race for Attorney General, only to find that the petition filing deadline was just around the corner and there were an insurmountable number of signatures to gather in the remaining time.

But the facts show that it was Graveline's personal decisions that kept him from qualifying for the ballot, not necessarily the filing deadline and the signature requirement.  Graveline explained that his motivation for entering the race late within the signature circulation period and fairly close in time to the filing deadline resulted from his disappointment with the presumptive candidates from the major parties.  (R.1-3, ¶3-4, 10, Page ID # 29-31, 34).  He stated that he entered the race, "when it became reasonably clear" to him that the major parties would not be nominating a candidate who shared his *non-partisan* ideals.  (R.1-3, ¶7, Page ID # 32).  But this rings hollow since the purpose of the major parties is to, in fact,

nominate partisan candidates for office.  A non-partisan candidate for Attorney

General was never going to be nominated by the major parties.

Even if Graveline waited because he wanted to learn more about who might

be nominated, the five major party candidates for Attorney General–Nessel, Miles,

and Noakes as Democrats, and Leonard and Schuitmaker as Republicans – had

declared their candidacies in the Fall of 2017 by publicly forming candidate

committees.  (R. 8, Page ID # 107 & n.1.)  A "reasonably diligent" potential

candidate would have at least been aware of who the contenders were going to be

at that point.  Graveline also cannot argue that the public was not yet politically

engaged when he admits that he was building his own opinions on the major party

candidates based upon news coverage more than two months before he entered the

race.  (R. 1-3, ¶3, Page ID #29-30).  Moreover, the Democratic Party held an early

endorsement convention on April 15, 2018, at which time the Party gave its

endorsement to Attorney General Dana Nessel.  (R. 1-3, ¶2-3, Page ID #29-30).

But still Graveline waited.  And part of his delay, as Graveline admitted, had

nothing to do with the field of candidates but rather the fact that he would have to

resign from his position at the U.S. Attorneys Office under the federal Hatch Act

before he could file as a candidate. (R. 1-3, ¶ 8, Page ID #32).

Graveline finally filed his paperwork on June 4, 2018, and began collecting

signatures a few days later, leaving him only 40 or so days to collect his 30,0000

signatures before the filing deadline, which he failed to do.  Even if an independent

candidate has some right to know or have an idea of who the major party

candidates for an office may be before deciding to run as an independent, it is plain

from the record that Graveline either had that knowledge or could have had that

knowledge well before June 2018.  *CF. Lawrence*, 430 F.3d at 373-74 ("[T]he

burden on independent candidates to file . . . before the primary is reasonable

because it prevents such candidates from being able to make a decision to run for

office after learning which candidates will be representing the major parties.").

The fact that it appears to have taken him weeks if not months to decide whether

he liked any of the candidates should not weigh against the filing deadline or the

signature requirement.  A reasonably diligent independent candidate would have

filed to run earlier.  See, e.g., *Storer*, 415 U.S. at 742 (in assessing ballot access

claims by independent candidates, the question is "could a reasonably diligent

independent candidate be expected to satisfy the signature requirements").

   Plaintiff Graveline's delay was unreasonable under the circumstances.  And

because he should have filed as a candidate earlier, there is no way to assess the

burden imposed by the signature requirement.  This is because had he filed earlier

he would have had more time to collect signatures, and could have collected

sufficient signatures.  Indeed, in the 42 days Graveline collected signatures, he

obtained 14,157 signatures, almost half the required 30,000.  *Id*., Page ID # 35, ¶¶
11, 13, 15.

In this case it was Graveline's dilatoriness that placed him in a race against
the clock—not the statutes.  Any burdens created by the filing deadline and
signature requirement were minimal; at best, the burden was somewhere between
the minimal and severe burdens contemplated in the *Anderson-Burdick* analysis,
which would require only a weighing of the supposed burden against the state's
interests and means of achieving them.  As discussed above, the filing deadline
advances the state's important regulatory interest in easing the administrative
burden of the Secretary of State and her staff, and the signature requirement
advances the state's interest in requiring independent candidates, like other
candidates, to demonstrate a modicum of public support before gaining access to
the ballot.

> **e.    Even if the burden imposed by Michigan's filing
> deadline and signature requirements were severe,
> Michigan's law is narrowly drawn.**

While Defendants maintain that the burdens imposed are not severe, even if
they were severe, the statutes would still be constitutional because they are
narrowly drawn to the state's compelling interests.  See *Ohio Democratic Party v.
Husted*, 834 F.3d at 627.

As discussed above, Michigan's law gives the Secretary of State 50 days from the filing deadline in which to review the petitions, resolve any challenges, and certify all non-affiliated candidate petitions.  This period of time is not excessive, considering the gravity of the tasks and the quantity of work required. The conclusion of that 50-day period is the Secretary of State's certification for all candidates, including the major party candidates.  Fifteen days after that certification, the ballots are supposed to be available to the public and mailed overseas.  The only way to extend the filing deadline would be to further limit the time for review of the petitions and completion of any legal challenges.  But this merely trades limits on the candidates for even harsher limits on challengers to their petitions, and on the staff whose job it is to review petition signatures.

Similarly, the 30,000 signature requirement is balanced to the need to protect against overcrowding ballots, confusing voters, and the rise of frivolous candidates.  Dr. Kelly's analysis shows that lowering the requirement to 5,000 could lead to nine or more candidates vying for statewide offices.  (Ex. G, p 9; Ex. I, p 1-2).  Mr. Albright, in turn, has stated that collecting 30,000 is "most certainly" possible for an independent candidate, when accompanied by appropriate planning and support. (Ex. F, p 3).

Michigan's statutory scheme, therefore, is narrowly drawn to achieve the important state interests of reviewing, printing, and distributing ballots that are not confusing or overcrowded with frivolous candidates.

> **2.    Plaintiffs have failed to meet their burden of production as to whether Michigan's laws prevent independent candidates from reaching the ballot.**

To determine the magnitude of the burden imposed by a state's election laws, courts consider the associational rights at issue, including: (1) "evidence of the real impact the restriction has on the process"; (2) "whether alternative means are available to exercise those rights"; and (3) "the effect of the regulations on the voters, the parties and the candidates." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006).

Plaintiffs rely extensively on Michigan's 30-year drought of independent candidacies appearing on a ballot. But Plaintiffs' use of half of a statistic, without more, does not satisfy their burden of proof. The historical fact is a numerator in need of a denominator; it means nothing without some accompanying evidence creating an inference that people were *trying* to launch independent candidates, yet failed. Plaintiffs have simply failed to produce evidence Michigan's statutory scheme has *prevented* independent candidates from accessing the ballot.

The conclusion Plaintiffs suggest—that because something has not happened means it has been prevented from happening—assumes causation without

evidence.  This type of incomplete historical evidence is not sufficient.  S*ee*

*Libertarian Party of Ohio*, 462 F.3d at 589 (stating that historical evidence is "not

conclusive in and of itself").  Plaintiffs must instead show that other candidates

have tried to comply with the requirements but come up short despite diligent

efforts.  To the extent that information is unavailable, that goes to Plaintiffs'

burden, not Defendants' wrongdoing.  Because Plaintiffs have failed to carry their

burden of proof, Michigan's election process must be allowed to proceed

unhindered by the federal courts.  *Ohio Democratic Party v. Husted*, 834 F.3d at

622. ("Proper deference to state legislative authority requires that Ohio's election

process be allowed to proceed unhindered by the federal courts.").

## CONCLUSION AND RELIEF REQUESTED

For the reasons set forth above, Defendants respectfully requests that this

Court grant summary judgment in their favor and dismiss this case.

Respectfully submitted,

*s/Erik A. Grill*
Erik A. Grill (P64713)
Heather S. Meingast (P55439)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  grille@michigan.gov
P64713

Dated:  August 15, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2019, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*s/Erik A. Grill*
Erik A. Grill (P64713)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan  48909
517.335.7659
Email:  grille@michigan.gov
P64713
