UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTOPHER GRAVELINE, et al.,

      Plaintiffs,

v.                              Case No. 18-12354
                                   Honorable Victoria A. Roberts

JOCELYN BENSON, in her official
capacity as Michigan Secretary
of State, et al.,

      Defendants.

_____/

### ORDER: (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 28]; AND (2) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF [ECF No. 30]

## I.    INTRODUCTION

This case concerns the constitutionality of a group of Michigan laws that govern an independent candidate's ability to be on the ballot for election to statewide office (i.e., the offices of governor, lieutenant governor, attorney general, secretary of state, and the offices of United States Senate and President).

Plaintiff Christopher Graveline ("Graveline") attempted to get on the November 2018 general election ballot as an independent, non-partisan candidate for attorney general. However, after failing to collect the number

of signatures required to appear on the ballot by the prescribed deadline, Graveline and three of his supporters (the "Voter-Plaintiffs"; collectively "Plaintiffs") filed this case against the Michigan Secretary of State (then Ruth Johnson; now Jocelyn Benson) and Sally Williams, the Director of Michigan's Bureau of Elections (collectively, "the State" or "Defendants").

They allege that the governing statutes – Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) – operate in combination to deprive them of their rights to freedom of speech and association, equal protection, and due process under the First and Fourteenth Amendments to the United States Constitution.

After briefing and a hearing, the Court entered a preliminary injunction – finding that Plaintiffs were likely to succeed in showing that Michigan's ballot access requirements for independent candidates for statewide office were, in combination, unconstitutional as applied to them. That injunction placed Graveline on the ballot for the 2018 election.

This matter is now before the Court on the parties' cross motions for summary judgment.  [ECF Nos. 28, 30].  The Court held a hearing on the motions on December 17, 2019.

For the reasons below, the Court **GRANTS** Plaintiffs' motion and **DENIES** Defendants' motion.

## II. BACKGROUND

### A. Michigan's Current Ballot Access Laws

Michigan law provides different filing and eligibility requirements for attorney general candidates based on their affiliation and/or candidacy type.

#### i. Independent Candidates

Michigan allows independent candidates for statewide office to be on the general election ballot if the candidate submits an affidavit and "qualifying petition." Mich. Comp. Laws §§ 168.590(1), 168.590c(2) (2008). A qualifying petition must have at least 30,000 valid signatures and must be submitted no later than "the one hundred-tenth day before the general election." *Id.* §§ 168.590c(2), 168.544f. Moreover, the signatures on a qualifying petition must be obtained within 180 days of the filing deadline, and as part of the signature requirement, a qualifying petition must be signed by at least 100 registered voters in each of at least half of Michigan's 14 congressional districts (the "geographic distribution requirement"). *Id.* § 168.590b(3).

The filing deadline for independent attorney general candidates for the November 6, 2018 election was July 19, 2018. Therefore, the official process for an independent candidate trying to run for attorney general in

the November 6, 2018 general election began in late January 2018 – 180 days prior to the July 19 deadline.

### ii. Major Party Candidates

Candidates for Michigan attorney general from the major political parties – Republican, Democratic, and Libertarian – are nominated at party conventions rather than elected in a primary. Candidates from these parties do not have to circulate nominating petitions or obtain signatures in support of their candidacies.

A major political party must hold its convention "not less than 60 days before the general November election." Mich. Comp. Laws § 168.591(1). In 2018, that deadline fell on September 7, 2018. Given this law, an independent candidate likely would be ignorant of the identities of the major party candidates before the independent candidate filing deadline.

### B. History of Michigan's Ballot Access Laws for Independent Candidates for Statewide Office

The three ballot eligibility requirements being challenged – the 30,000 signature requirement, the filing deadline, and the geographic distribution requirement – have, in all material respects[1], been in effect since 1988.

_____

[1] Michigan amended its signature requirement for independent candidates for statewide office in 1999, by changing it from one percent of the total vote for governor in the preceding election to the current requirement of 30,000 signatures. No party to this case contends that this change was material.

Michigan's 30,000 signature figure equates to just less than one percent of ballots cast for attorney general in the past two elections, 2018 and 2014.

Since Michigan enacted this statutory scheme in 1988, no independent candidate for statewide office has qualified for the ballot. This does not include independent candidates for the President of the United States; two independent candidates for President did satisfy Michigan's statutory scheme – Ross Perot in 1992 and Ralph Nader in 2004.

A significant number of people have attempted to qualify for the ballot as independent candidates for statewide office since 1988. Based on records submitted by Defendants showing the number of independent candidate committees formed, there have been 30 individuals since 1997 who tried to get on ballots as independent candidates for statewide offices.

This alone is sufficient to show a significant number of attempts to satisfy Michigan's electoral scheme by independent candidates for statewide office. However, these records are incomplete in material ways. First, the records only go back to 1997, not 1988. The records also do not include the number of committees formed for all statewide offices; they do not include the number of independent candidates who attempted to run for United States Senate in Michigan. Finally, as Defendants acknowledge,

the 30 candidates/committees shown by the records do not include

"pending" committees; when including pending committees – which

Defendants describe as committees that have "not completed the process"

and were "not [] legally formed," [ECF No. 34, PageID.646] – the number of

candidates would be 46 since 1997.

### C.      Practicalities of Circulating Petitions/Collecting Signatures

The parties agree that mounting a successful all-volunteer signature

collection effort is difficult to accomplish.  Indeed, Lee Albright – a signature

gathering expert retained by the State with nationwide experience

gathering signatures for petition efforts since 1988, including several

statewide petition efforts in Michigan – opined that, "[w]hile [he] ha[s] seen

some successful efforts by volunteers to qualify a petition for the ballot, it is

unusual. Most often, all-volunteer efforts fail and professionals are used to

augment signature gathering efforts."  [ECF No. 28-7, PageID.391].

The difficulty of complying with a high signature requirement is

multiplied by the fact that a 75% validity rate is "the industry standard" –

and even that rate "can be difficult to maintain."  [*Id.*, PageID.390].

Assuming a 75% validity rate, that means an independent candidate for

statewide office would need to collect 40,000 signatures to be assured of

qualification.  [*Id.*].

Although Mr. Albright indicates there are too many variables for him to attach a range of costs to a paid signature-gathering effort, the limited evidence in the record shows paying for such effort is costly. [*Id.*, PageID.391]. Moreover, "[e]ven volunteer efforts have a cost attached to them – petition processing and verification, etc." [*Id.*, PageID. 392].

As discussed below, to the extent Graveline used a professional signature-gathering firm, he paid $6 per signature, with a guaranteed 75% validity rate. Notably, Mr. Albright opines – with some speculation – that had Graveline used the entire 180 days allowed by statute, "his costs per signature *might* have been lower." [*Id.* (emphasis added)]. Nevertheless, even assuming the cost for a professional signature-gathering firm which guarantees a 75% validity rate is only $3 per signature collected – half of what Graveline paid – it would cost an independent candidate without a volunteer collection effort $120,000 to comply with Mich. Comp. Laws. § 168.544f.

### D. Graveline's Campaign Efforts

Graveline waited to begin his campaign until June 4, 2018. His delay was based on two factors. First, Graveline stated that he "only entered th[e] [attorney general] race when it became reasonably clear to [him] that the Democratic and Republican Parties would be nominating candidates

who d[id] not subscribe to [his] ideals." [ECF No. 1-3, PageID.32]. The earliest he made this decision was after the Democratic Party's April 15, 2018 informal, early endorsement convention. [*Id.*, PageID.29-32]. The second factor which delayed the launch of Graveline's campaign was his occupation as an Assistant United States Attorney; as a federal employee, the Hatch Act required Graveline to resign his position before he could file as a candidate for what is considered a partisan office. [*Id.*, PageID.32-33]. Thus, while Graveline was seriously considering an independent candidacy in May 2018, he was not able to file formally until after he resigned from federal service.

From June 7 until the July 19 deadline, Graveline collected 14,157 signatures. [*Id.*, PageID. 34-35]. Assuming a 75% validity rate, this amounted to approximately 10,600 valid signatures.

Graveline and 231 volunteers collected 7,899 signatures. [*Id.*]. Graveline also retained a professional signature-gathering firm which gathered over 6,000 signatures; the firm charged $6 per signature and guaranteed at least 75% of the signatures it collected would be valid. [*Id.*]. This effort required over 1,000 hours of volunteer time and the expenditure of $38,000. [*Id.*].

Graveline attempted to file his petition on July 19. However, although Graveline satisfied § 168.590b(4)'s geographic distribution requirement by gathering at least 100 signatures in 12 of Michigan's 14 congressional districts, the State rejected the petition because it did not contain 30,000 signatures.

**E.    The Complaint**

Graveline and the Voter-Plaintiffs – Willard Johnson, Michael Leibson, and Kellie Deming – filed this case on July 27, 2018. Each of the Voter-Plaintiffs is a registered Michigan voter who wanted to vote for Graveline as an independent candidate for attorney general. They also say they want to vote for independent candidates for Michigan attorney general (and other statewide office positions) in future elections.

Plaintiffs' complaint contains three causes of action, though Plaintiffs abandoned Count I. [*See* ECF No. 12, PageID.150]. Both remaining claims set forth an as applied challenge to §§ 168.590c(2), 168.544f, and 168.590b(4). Plaintiffs allege that, in combination, those statutes function as an absolute bar to independent candidates for statewide office.

In Count II, Plaintiffs allege that as applied and in combination, the challenged statutes deprive them of their rights to freedom of speech and

association, equal protection, and due process under the First and Fourteenth Amendments to the United States Constitution.

In Count III, the Voter-Plaintiffs allege that the combined effect of Michigan's statutory scheme violates their right to "cast a meaningful and effective vote" because they are unable to vote for Graveline or another non-partisan candidate.

Plaintiffs seek an order declaring §§ 168.590c(2), 168.544f, and 168.590b(4) unconstitutional "as applied in combination to [them]."

## F. Procedural Posture

Shortly after filing the complaint, Plaintiffs moved for preliminary injunction. After briefing and argument, the Court granted the motion, finding that Plaintiffs were likely to succeed on the merits by showing that "the combination of Michigan's ballot access regulations severely burdens their fundamental rights under the First and Fourteenth Amendments[,]" and that the State "[fell] far short of satisfying its burden to show that the severe burdens caused by the scheme are justified."

The Court ordered that: "(1) Graveline must immediately present his qualifying petition . . . to the Bureau of Elections; (2) The State must accept Graveline's filing as complete and determine the validity of the signatures in time to place Graveline on the ballot if he has sufficient valid signatures;

and (3) If Graveline has at least 5,000 valid signatures . . . [,] his name must be placed on the November 6, 2018 general election ballot as an independent candidate for the Office of Michigan Attorney General."

The State filed a notice of appeal and moved in this Court to stay the preliminary injunction pending appeal. The Court denied the motion to stay.

Defendants then filed a motion to stay with the Sixth Circuit.

On September 6, 2018, the Sixth Circuit denied the motion, finding that: (1) "[t]he numerical signature requirement here, in combination with the signature collection window and filing deadline, is a severe burden on independent candidates and those who wish to vote for them," *Graveline v. Johnson*, 747 Fed. Appx. 408, 414 (6th Cir. 2018); and (2) although "the State's generalized interests [regarding] the integrity of its election process, the prevention of voter confusion, and the screening out of frivolous candidates . . . are important state interests[,]" the State failed to show "that [its] laws are narrowly drawn to protect its interests," *id.* at 415. Notably, the Sixth Circuit did not discuss the geographic distribution requirement because "Graveline was able to comply with the requirements of Michigan Compiled Laws § 168.590b(4), . . . and so he does not contest that requirement." *Id.* at 410 n.1.

After review of his petition, the State placed Graveline on the November 6, 2018 general election ballot as an independent candidate for attorney general.

On August 15, 2019, the parties filed cross motions for summary judgment. The Court held a hearing on the motions on December 17, 2019.

During the hearing, Plaintiffs indicated that – contrary to the statement in the Sixth Circuit's opinion denying the State's motion to stay, *see Graveline*, 747 Fed. Appx. at 410 n.1 – they maintain their challenge to the geographic distribution requirement as part of their "combined effect" claims.  While Plaintiffs acknowledged that their claims focused primarily on the burden imposed by the high signature requirement and early filing deadline, they did not intend to abandon their claim that the geographic distribution requirement was also a burden; rather Plaintiffs say it compounds the burden imposed by the signature requirement and early filing deadline.

## III.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The movant bears the initial burden to inform the Court of the basis

for its motion; it must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the non-moving party must set forth specific facts showing a genuine issue for trial. *Id.* at 324. Unsupported, conclusory statements are insufficient to establish a factual dispute to defeat summary judgment, as is the "mere existence of a scintilla of evidence in support of the [non-movant's] position"; the evidence must be such that a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

In deciding a summary judgment motion, the Court "views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court need only consider the cited materials, but it may consider other evidence in the record. Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. "The standard of review for cross-motions for summary judgment does not differ from the standard applied

when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011).

## IV. JUSTICIABILITY ISSUES

### A. Mootness

Defendants contend this case no longer presents a "live" controversy and is moot because the 2018 election is over, and the Court granted Graveline the relief he sought by placing him on the ballot.  However, Plaintiffs also seek a declaration that the challenged statutes are unconstitutional as applied in combination.  This case is not moot; it falls within the exception to the mootness doctrine for cases which are capable of repetition yet evade review.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979).  A "live" controversy is one that "persist[s] in 'definite and concrete' form even after intervening events have made some changes in the parties' circumstances." *Mosley v. Hairston*, 920 F.2d 409, 414 (6th Cir. 1990).  "The mootness inquiry must be made at every stage of the litigation." *Lawrence v. Blackwell*, 430 F.3d 368, 370-71 (6th Cir. 2005).

"An exception to the mootness doctrine exists for wrongs that are 'capable of repetition, yet evading review.'" *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006) (citations omitted). This exception applies when: "(1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration[;] and (2) there is a reasonable expectation or a demonstrated probability that the controversy will recur." *Id.* "The party asserting that this exception applies bears the burden of establishing both prongs." *Lawrence*, 430 F.3d at 371.

Considering that less than four months elapsed between the filing of this case and the occurrence of the election, the first element is clearly met – i.e., the challenged action was too short in duration to be fully litigated prior to the conclusion of the election cycle. *See id.* ("Challenges to election laws are one of the quintessential categories of cases which usually fit [the first] prong because litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant election."); *Libertarian Party of Ohio*, 462 F.3d at 579. Defendants concede this.

Plaintiffs also demonstrate that there is a reasonable expectation that this controversy will recur. As Plaintiffs assert, the evidence that no independent candidate ever complied with the challenged provisions in the

30 years since they were enacted supports the conclusion that there is a reasonable likelihood that the controversy will recur.  *See Lawrence*, 430 F.3d at 371 ("The law at issue is still valid and applicable to both Lawrence and any independent candidate Shilo might wish to vote for in future election years. Therefore, the controversy is capable of repetition.").

Indeed, the capable of repetition prong is even more clearly satisfied here than in *Lawrence*, where Shilo, a voter-plaintiff, did not submit evidence that she wished to vote for an independent candidate in the future.  *See id.* ("Neither is an explicit statement from Shilo necessary in order to reasonably expect that in a future election she will wish to vote for an independent candidate who did not decide to run until after the early filing deadline passed.").

Unlike the plaintiffs in that case, *see id.*, the Voter-Plaintiffs submitted uncontested evidence that they wish to associate with and vote for independent candidates for statewide office in future elections.  [*See* ECF No. 30-5, PageID.550-51; ECF No. 30-6, PageID.553-54].

The Court finds the challenged provisions will burden the Voter-Plaintiffs' First and Fourteenth Amendment rights in future elections, just as they did in 2018.  The "capable of repetition, yet evading review" exception applies.

**B.     Standing**

Under Article III of the Constitution, federal courts are limited to deciding "Cases" or "Controversies."  U.S. Const. art. III, § 2.  One essential element of a legal case or controversy is that the plaintiff has standing to sue.  To establish Article III standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a "likel[ihood] . . . that the injury 'will be redressed by a favorable decision.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted); *see also Barry v. Lyon*, 834 F.3d 706, 715 (6th Cir. 2016) ("Plaintiffs have standing if they suffer a 'concrete,' 'particularized,' and 'actual' or 'imminent' injury that is caused by a defendant's conduct and is likely to be 'redressed by a favorable decision.'" (citation omitted)).

The State admits that Plaintiffs had standing when they filed this case.  However, it says they can no longer demonstrate actual, imminent injury.  The Court disagrees.

Plaintiffs sufficiently alleged that they suffered an injury due to Michigan's ballot access requirements for independent candidates for statewide office.  Moreover, the State has "not explicitly disavowed enforcing [these requirements] in the future."  *Green Party of Tennessee v.*

*Hargett*, 791 F.3d 684, 696 (6th Cir. 2015). "In such situations, the Supreme Court has held that plaintiffs have standing to challenge statutes." *Id.* (citation omitted). Plaintiffs have standing on this basis alone.

In addition, the Voter-Plaintiffs allege the challenged statutes will function as an absolute bar to independent candidates for statewide office seeking ballot access in the future. This will cause harm to Voter-Plaintiffs at the next election. Thus, Voter-Plaintiffs establish standing: they allege a sufficient actual and/or imminent injury, which is traceable to the State, and which could be redressed by a favorable decision. *See Barry*, 834 F.3d at 715.

Article III's case-or-controversy requirement is satisfied.

## V.    ANALYSIS

### A.    Legal Standard for Ballot Access Challenges

An independent candidate for Michigan attorney general will not appear on the general election ballot unless he or she satisfies the early filing deadline and signature and distribution requirements in Mich. Comp. Laws §§ 168.590c, 168.544f, and 168.590b(4), described above.

Ballot access laws, such as these, "place burdens on two different, although overlapping, kinds of rights – the right of individuals to associate

for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968); *see also Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters." (citation omitted)).

Although "[b]oth of these rights . . . rank among our most precious freedoms," *Williams*, 393 U.S. at 30, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution," *Libertarian Party of Ohio*, 462 F.3d at 585. Indeed, states must enact reasonable regulations to ensure campaigns and elections are orderly and fair. *Id.*; *see also Storer v. Brown*, 415 U.S. 724, 730 (1974). As such, not all election laws are subjected to heightened scrutiny analysis. *Id.* The Supreme Court set forth the appropriate analytical framework for reviewing state election regulations in *Anderson* and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under the *Anderson-Burdick* framework, the Court first looks at the "character and magnitude of the asserted injury" to Plaintiffs' asserted constitutional rights. *Anderson*, 460 U.S. at 789. After assessing Plaintiffs'

injury, the Court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* In doing this, the Court must "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* Finally, the Court must weigh these factors to determine whether the state law is constitutional. *Id.*

The level of scrutiny "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. If the burden is "severe," strict scrutiny applies; that is, the "regulation will only be upheld if it is 'narrowly drawn to advance a state interest of compelling importance.'" *Lawrence*, 430 F.3d at 373 (quoting *Burdick*, 504 U.S. at 434); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest."). If the regulations do not seriously burden a plaintiff's rights, the state's regulatory interests will typically be enough to justify "reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

## B. The Character of the Asserted Injury to Plaintiffs' Rights

Plaintiffs allege that, in combination, Michigan's regulations preclude independent candidates for state attorney general and other statewide

offices from qualifying for the ballot.  They say this harms them in several

ways.  It (1) infringes on Graveline's right to appear on the general election

ballot as an independent, non-partisan candidate for attorney general; (2)

violates the Voter-Plaintiffs' right to "cast a meaningful and effective vote";

and (3) hinders their freedom to associate for the advancement of their

political beliefs.

The nature of Plaintiffs' alleged injuries involves some of our most

fundamental rights and goes to the heart of effective participation in the

election process; indeed, "[t]he right to cast an effective vote 'is of the most

fundamental significance under our constitutional structure[,]' and [t]he

rights of political association and free speech occupy a similarly hallowed

place in the constitutional pantheon."  *Libertarian Party of Ohio*, 462 F.3d at

585 (quoting *Burdick*, 504 U.S. at 433); *see also California Democratic

Party v. Jones*, 530 U.S. 567, 574 (2000) ("Representative democracy in

any populous unit of governance is unimaginable without the ability of

citizens to band together in promoting among the electorate candidates

who espouse their political views."); *Green Party of Mich. v. Land*, 541 F.

Supp. 2d 912, 917 (E.D. Mich. 2008); *Mogk v. City of Detroit*, 335 F. Supp.

698, 700 (E.D. Mich. 1971) ("*Reynolds [v. Sims*, 377 U.S. 533 (1964)], and

*Williams*, [393 U.S. 23], hold that a citizen has a right to vote effectively

and, by logical extension, that means that he is to be given a wide latitude in his choice of public officials. His right to support a candidate of his choice – including himself – cannot be arbitrarily restricted."); *Bolanowski v. Raich*, 330 F. Supp. 724, 727 (E.D. Mich. 1971) ("The Supreme Court has also made it clear that when the right of association and the right to vote effectively are infringed, 'only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. *NAACP v. Button*, 371 U.S. 415, 438 (1963)'" (quoting *Williams*, 393 U.S. at 31)).

### C.    The Magnitude of the Asserted Injury to Plaintiffs' Rights
#### i.  The Parties' Positions

Plaintiffs say Michigan's ballot access statutes significantly burden their rights because the deadline requires that independent candidates conduct petition drives well before major party nominees are selected and before voters are paying attention to, much less actively engaged in, the electoral process.  They contend that the early filing deadline imposed by § 168.590c(2) is even more burdensome as applied in conjunction with the high signature requirement imposed by § 168.544f and the signature distribution requirement in § 168.590b(4).

Plaintiffs say Michigan's 30,000 signature requirement for independent candidates for statewide office is among the most restrictive in the nation; only five states impose a higher absolute number of required signatures.

In support of this assertion, Plaintiffs rely on the declaration of Richard Winger.  Courts in ten states have accepted him as an expert witness concerning ballot access for minor parties and independent candidates.  [*See* Winger Declaration, ECF No. 1-2, PageID.20, 22]; *see also Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1348 (N.D. Ga. 2016) ("Courts have considered Mr. Winger's expert testimony in many other cases and this Court finds that he is a reliable witness.  Moreover, the Court primarily has relied on Mr. Winger as a gatherer of data, and there is no suggestion here that the data are inaccurate."), *aff'd*, 674 Fed. Appx. 974 (11th Cir. 2017).  Although the State contests the relevancy of some of Mr. Winger's conclusions, it does not object to him as an expert.  The Court finds Mr. Winger is a reliable witness and accepts his conclusions as true.

Plaintiffs say the difficulty of complying with Michigan's high signature requirement is further compounded by the substantial financial and human resources needed to satisfy the distribution requirement, which necessitates fielding petition circulators in half the congressional districts in

the state. Plaintiffs say their efforts to comply with Michigan's statutes – as summarized above – demonstrate the nature of these burdens. Though Graveline spent $38,000 and received over 1,000 volunteer hours from 231 individuals, his campaign only made it roughly halfway to Michigan's signature requirement. Moreover, Plaintiffs rely on the report of Mr. Albright, which – among other things – establishes that most volunteer efforts to gather signatures fail, and this requires the candidate to retain a professional signature-gathering firm.

Finally, Plaintiffs argue that, taken together, Michigan's provisions impose burdens so severe that they function as an absolute bar to independent candidates for statewide office seeking access to Michigan's general election ballot.

The State says Graveline's failure to qualify for the ballot is entirely due to his late start in collecting signatures. It says the ballot access requirements impose only a minimal burden on independent candidates for statewide office.

The State does not dispute that all but five states have a lower absolute number of signatures required for independent candidates seeking to run for statewide office. However, the State says its signature requirement is neither unusual for the size of its population nor

unreasonable.  In support of this assertion, the State says the 30,000 signatures is less than one percent of the votes cast in the prior two elections for attorney general.  Moreover, it says that Michigan's signature requirement is in the 67th percentile relative to percentage of state population; this works out to 15 states with a higher per capita signature requirement.  [*See* ECF No. 28-8, PageID.402-03].

In support of this assertion, the State relies on the report of Dr. Coleen Kelly, a statistician.  [*Id.*].  This finding is not contested.  While Plaintiffs contest the relevancy of some of Dr. Kelly's conclusions, they do not object to her as an expert.  The Court accepts Dr. Kelly as an expert.

The State says the burden imposed by its laws are minimal because Mr. Albright opined that "gathering 30,000 valid signatures . . . within the 180 days allowed can most certainly be done."  [ECF No. 28-7, PageID.392].

Finally, the State says the fact that no independent candidate for statewide office has appeared on the ballot since this statutory scheme was adopted in 1988 does not mean the regulations severely burden independents.  Rather, it says the records showing the number of independent committees formed for statewide office since 1997 demonstrate that "the 30-year absence of such candidates from the ballot

is more probably linked to a general lack of interest in independent candidacies in [Michigan] as opposed to any institutional bar." [ECF No. 34, PageID.647].

### ii. Analyzing the Magnitude of the Injury

In determining the magnitude of the burden imposed by a state's election laws, the Sixth Circuit instructs the Court to consider the associational rights at issue, including: (1) "evidence of the real impact the restriction has on the process"; (2) "whether alternative means are available to exercise those rights"; and (3) "the effect of the regulations on the voters, the parties and the candidates." *Libertarian Party of Ohio*, 462 F.3d at 587. Importantly, the Court must consider the "combined effect" of the challenged regulations, rather than each statute's requirement by itself. *See id.* at 586 ("Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights.").

The Court considered the three associational rights at issue and concludes that the combined effect of Michigan's statutory scheme severely burdens Plaintiffs' fundamental rights.

### a. Evidence of the Real Impact the Restrictions Have on the Process and the Effect of the Regulations on the Voters, the Parties, and the Candidates

Examination of historical data is key to evaluating the "real impact" laws have on the election process and ballot access that independent candidates (or minor parties) have been able to obtain. *Libertarian Party of Ohio*, 462 F.3d at 589-90 ("While not conclusive in and of itself, the Supreme Court has noted that a historical record of parties and candidates being unable to meet the state's ballot-access requirements is a helpful guide in determining their constitutionality.").  Indeed, in *Storer*, the Supreme Court remanded the case and instructed the district court to consider whether:

> a reasonably diligent independent candidate [could] be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

*Storer*, 415 U.S. at 742; *Fishbeck v. Hechler*, 85 F.3d 162, 164-65 (4th Cir. 1996) (examining historical data to determine severity of burden on minor party candidates).  *See also Jenness v. Fortson*, 403 U.S. 431, 438 (1978) (considering whether state elections laws "operate[d] to freeze the political status quo").

Michigan's history is telling.  The current Michigan statutory scheme was adopted in 1988.  In the thirty years since, no independent candidate for statewide office has qualified for the ballot.

Contrary to the State's assertion, the records showing the number of independent candidate committees formed since 1997 do not establish that the 30-year absence of independent candidates from the ballot is due to a general lack of interest in independent candidacies in Michigan.  Although incomplete in several ways, those records still show that a significant number of individuals attempted to qualify for the ballot as independent candidates for statewide office.  Moreover, Defendants fail to cite any authority for the proposition that a plaintiff challenging ballot access laws must produce evidence of candidates who tried but failed to qualify.

This historical evidence paints a clear picture of the "real impact the restriction[s] ha[ve]" on Plaintiffs and demonstrates the severe burden Michigan's scheme has on independent candidates for statewide office. *See Libertarian Party of Ohio*, 462 F.3d at 587.

Plaintiffs say, "Mr. Albright's opinion that it is '*certainly possible'* for an independent candidate to collect 30,000 valid signatures . . . [does not] tell us anything about the constitutionality of the current Michigan laws. The test is not whether it is theoretically possible for a candidate to collect

enough signatures." [ECF No. 33, PageID.634 (emphasis added)]. The Court agrees.

Indeed, there can be significant burdens within this realm of possibilities. In fact, Mr. Albright's report demonstrates that Michigan's requirements are severely burdensome to comply with. As set forth above, *supra* Section II(C), his report demonstrates that because all-volunteer efforts "most often fail," an independent candidate for statewide office in Michigan will have to spend significant money for a professional signature-gathering firm on top of the money associated with volunteer efforts. [*See* ECF No. 28-7, PageID.390-92].

Coupled with the historical evidence of a 30-year absence of independent candidates for statewide office on the ballot, it is clear that Michigan's statutory scheme imposes a severe burden on independent candidates and those who wish to vote for them.

The Court finds that the State's election laws "operate to freeze the political status quo," and effectively bar independent candidates from accessing the ballot. *See Jenness*, 403 U.S. at 438; *Storer*, 415 U.S. at 742. *See also Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) (finding that Arizona filing deadline for independent candidates "severely burdened" speech, voting, and associational rights of independent

candidate and supporters where history showed that no independent candidate had appeared on the ballot since 1993, when Arizona changed its filing deadline from 10 days after the primary election to 75 days before the primary election); *Delaney v. Bartlett*, 370 F. Supp. 2d 373, 377-78 (M.D.N.C. 2004) (finding that North Carolina regulation "severely disadvantage[d]" independent candidates and warranted strict scrutiny where the "historical evidence of ballot exclusion" of independent candidates in comparison with party candidates showed that "only one unaffiliated candidate has been placed on the ballot as a contender for statewide office" over the preceding 20 years).

That no independent candidate for statewide office has ever satisfied Michigan's current statutory scheme to qualify for the ballot demonstrates "the regulations impose a severe burden that has impeded ballot access." *See Brewer*, 531 F.3d at 1038.

### b. <u>No Alternative Means are Available to Plaintiffs to Exercise Their Rights</u>

There are no alternative means for Graveline – or other prospective non-partisan candidates for statewide office – to appear on the ballot as independent candidates.

And, the Supreme Court spoke on the inadequacy of a write-in candidacy: "[t]he realities of the electoral process . . . strongly suggest that

'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot." *Lubin v. Panish*, 415 U.S. 709, 719 n.5 (1974); *see also Anderson*, 460 U.S. at 799 n. 26 ("We have previously noted that [a write-in] opportunity is not an adequate substitute for having the candidates name appear on the printed ballot").

Because the Michigan statutory scheme prevented independent candidates for statewide office from accessing the ballot, and write-in access in inadequate, the Voter-Plaintiffs have no alternative means to exercise their right to cast votes effectively in the way they want to.

This factor shows that the challenged regulations severely burden Plaintiffs' rights.

### c. The Combined Effect of the Regulations Demonstrates that They Severely Burden Plaintiffs' Rights

In cases analyzing ballot access, "the Supreme Court 'focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.'" *Libertarian Party of Ohio*, 462 F.3d at 588 (quoting *Anderson*, 460 U.S. at 793).

"'A burden that falls unequally on . . . independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates – and of particular importance – against those voters whose political preferences lie outside the existing political parties.'" *Id.* (quoting *Anderson*, 460 U.S. at 793-94).

Courts further note that "[u]naffiliated candidates enhance the political process by challenging the status quo and providing a voice for voters who feel unrepresented by the prevailing political parties." *Delaney*, 370 F. Supp. 2d at 377 (citing *Anderson*, 460 U.S. at 794). Moreover, "independent candidates in particular play an important role in the voter's exercise of his or her rights." *Green Party of Georgia*, 171 F. Supp. 3d at 1352. In light of this, and because independent candidates are more responsive to emerging issues and less likely to wield long term or widespread governmental control, "independent candidacies must be accorded even more protection than third party candidacies." *Cromer v. South Carolina*, 917 F.2d 819, 823 (4th Cir.1990). Michigan's election laws fail to account for these important considerations.

Although the State attempts to explain why each challenged requirement does not impose a severe burden on Plaintiffs, it looks at each requirement separately and fails to discuss the statutory scheme's

combined effect.  In doing so, the State relies on cases upholding laws requiring a candidate or party to collect an amount of signatures equivalent to Michigan's 30,000 signature requirement.  [ECF No. 28, PageID.336-37 (citing *Lawrence*, 430 F.3d at 375 (upholding one-percent signature requirement for independent candidates); *De La Fuente v. California*, 278 F. Supp. 3d 1146, 1155 (C.D. Cal. 2017) (finding California's requirement that independent candidates for president obtain signatures from one percent of the electorate was not objectively unreasonable and was not a severe burden on independent candidates)].

The State's analysis of each requirement separately is contrary to the applicable standard recognized by the Supreme Court and set forth in *Libertarian Party of Ohio*.  *See id.*, 462 F.3d at 593 ("It is this combined burden on the party's rights that we must address.").

After addressing each requirement separately, the State summarily states that their combined effect does not impose a severe burden, that Graveline is merely a victim of his own lackadaisical approach to qualifying, and "[a]ny burdens created by the filing deadline and signature requirement were minimal."  [ECF No. 28, PageID.345].

The State's analysis and conclusion miss the mark.  The evidence – including the report of the State's expert, Mr. Albright – resoundingly

demonstrates that the combined effect of Michigan's ballot access scheme severely burdens independent candidates for statewide office.

Indeed, this was the exact holding of the Sixth Circuit. *Graveline*, 747 Fed. Appx. at 414.

Importantly, the Sixth Circuit distinguished *Lawrence* – the main Sixth Circuit case the State relies upon, [*see* ECF No. 28, PageID.336-37] – and found that Michigan's electoral scheme for independent candidates for statewide office was similar to *Libertarian Party* – where the Sixth Circuit held unconstitutional an Ohio law requiring minor political parties to file a petition 120 days before the primary with a number of signatures equal to one percent of the total votes cast in the previous election in order to have a candidate on the general election ballot. *Graveline*, 747 Fed. Appx. at 413; *Libertarian Party of Ohio*, 462 F.3d at 582-83.

> [Michigan's] requirements fall between those at issue in [*Lawrence* and *Libertarian Party of Ohio*]. . . .
>
> The burden at issue in *Lawrence* was found to be neither severe nor inherently unreasonable in part because "all candidates seeking a place on the ballot in November must engage in substantial campaign work before the early primary." *Lawrence*, 430 F.3d at 373. The law at issue allowed an independent candidate to collect signatures up to the day before the primary, whereas the law applicable to party-affiliated candidates required them to file papers sixty days before the primary and then campaign for and win the party nomination. *Id.* "All candidates are burdened ... but there is no particular group which feels the additional burden of being

placed at a disadvantage with respect to the rest of the field." *Id.* We expressly emphasized that the filing deadline at issue was one day prior to the primary, and we acknowledged that many cases found that "early filing deadlines impose a severe burden." *Id.* at 374 and n.2.

Then, in *Libertarian Party*, we held that the Ohio law requiring minor parties to file a petition 120 days before the primary posed a severe burden because "[d]eadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized.... Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party." 462 F.3d at 586. We noted that "the great weight of authority [] has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections," raising *Lawrence* as an example. *Id.* at 590. The deadline far in advance of the primary, in combination with a one-percent signature requirement, was a severe burden for that reason.

Michigan's treatment of independent candidates for statewide office falls closer *to Libertarian Party* than to *Lawrence*. Graveline was required to submit his petition on July 19; the nominating conventions (there being no primaries) were required to be held by September 7, a 50-days-in-advance deadline. Although not as extreme as the 120 days in *Libertarian Party*, it is reasonable to conclude that this early deadline has the same effect of requiring an independent candidate "to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized." *Libertarian Party of Ohio*, 462 F.3d at 586. This is not requiring a state to "give independent candidates the advantage of jumping into a race in response to late-breaking events ... when major parties do not have the same flexibility." *Lawrence*, 430 F.3d at 374. The major parties in Michigan remain able to nominate any candidate until the nominating convention. Nor are independent candidates equally

burdened, as was the case, crucially, in *Lawrence*. *Id.* at 373. Here, the major party candidates are not required to obtain advance support during the same time that an independent candidate must canvas for signatures.

All told, Michigan's system works to disadvantage independent candidates alone by requiring them to seek a significant number of signatures from an electorate that is not yet politically energized. We did uphold a similar numerical signature requirement in *Lawrence*, but in that case the late filing deadline alleviated the burden. And although the Supreme Court upheld a five-percent signature requirement in *Jenness v. Fortson*, 403 U.S. 431, 438, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), that signature requirement was analyzed using a less stringent framework than that required by *Anderson* and *Burdick*. *See Anderson*, 460 U.S. at 817, 103 S.Ct. 1564 (Rehnquist, J., dissenting) (distinguishing the standard used in *Jenness* from the "narrowly tailored" test applied in *Anderson*); *see also Green Party of Georgia v. Kemp*, 171 F.Supp.3d 1340 (N.D. Ga. 2016) (finding a one-percent signature requirement to be a severe burden and setting a requirement of 7,500 signatures), *aff'd* 674 F. App'x 974 (11th Cir. 2017) ("The judgment of the district court is affirmed based on the district court's well-reasoned opinion."). The numerical signature requirement here, in combination with the signature collection window and filing deadline, is a severe burden on independent candidates and those who wish to vote for them.

*Graveline*, 747 Fed. Appx. at 413-14 (internal footnote omitted).

The Court adopts the reasoning and conclusion from the Sixth Circuit. Although the State introduced additional evidence since the preliminary injunction stage, none of it undermines the Sixth Circuit's conclusion.

In sum, the historical evidence shows that no independent candidate for statewide office has appeared on the ballot since 1988. This is twice as

long as the historical evidence considered in *Brewer*, *supra*, and ten years longer than the historical data considered in *Delaney*, *supra*.  Both courts held that the effect of the state laws' exclusion of independent candidates from the ballot severely burdened the rights of independent candidates and their supporters.

The Court finds that Plaintiffs establish that the combined effect of Michigan's ballot access regulations severely burdens independent candidates for statewide office and voters who wish to support for them.

## D.    Strict Scrutiny Applies

Because the combined application of Michigan's ballot access regulations severely burdens Plaintiffs' rights, strict scrutiny applies.  The State is required to set forth precise interests of compelling importance and show that the regulations are necessary and narrowly tailored to advance those interests. *See Timmons*, 520 U.S. at 358; *Anderson*, 460 U.S. at 789.

### i.  The Interests of the State

The State has legitimate interests for each of the challenged statutory requirements.

The State says the geographic distribution requirement and signature requirement serve the State's interest in ensuring candidates for statewide office have a significant modicum of support before gaining access to the

ballot.  Ensuring candidates have significant support also helps advance the State's interests in maintaining the integrity of the voting process, which includes avoiding voter confusion, overcrowded ballots, and frivolous candidates.  Each of these is well-recognized as important state interests. *See Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 577 (6th Cir. 2016).

With respect to the filing deadline, the State correctly points out that states have the power to prescribe time, place, and manner restrictions for elections to ensure they are "fair and honest and [maintain] some sort of order, rather than chaos."  *See Storer*, 415 U.S. at 730.  Moreover, the Sixth Circuit recognizes that "easing administrative burdens" on elections officials is "undoubtedly '[an] important regulatory interest[].'"  *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (citation omitted). The filing deadline advances that interest by ensuring the Secretary of State and her staff have sufficient time to canvass qualifying petitions to meet other deadlines.

### ii.  Whether the Requirements are Narrowly Tailored

The State sets forth sufficient evidence to show that the deadline for independent candidates to file their qualifying petitions under § 168.590c(2)

(i.e., 110 days before the general elections) is narrowly drawn to advance compelling state interests.

The affidavit of Defendant Sally Williams, Michigan's Director of Elections, demonstrates that the filing deadline is part of a series of deadlines culminating in the 45th-day deadline for having ballots available to absent voters.  [*See* ECF No. 28-2, PageID.253-59].  The 110th day filing deadline gives the State a 50-day window before the ballot certification deadline, which is 60 days before the general election.  [*Id.*, PageID.352].  During those 50 days, the Secretary of State must, among other things: (1) canvass all qualifying petitions filed for statewide offices to determine whether the required number of signatures have been collected; (2) conduct a more in-depth and time-consuming review of any petitions for which it receives a third-party challenge; and (3) complete any legal challenges related to any qualifying petitions.  [*Id.*, PageID.357-61].

Defendants establish that the deadline for independent candidates to submit qualifying petitions is not arbitrary; it is part of a carefully constructed set of election deadlines that is narrowly tailored to serve the State's important interests set forth above.

The State also shows that the geographic distribution requirement is narrowly drawn to advance its important interest in ensuring candidates have statewide support.

However, the State falls far short in showing that its 30,000 signature requirement is narrowly tailored to advance these state interests.

Even though the signature requirement is one of the two main issues in this ballot challenge, to its detriment the State addresses it only summarily:

> [T]he 30,000 signature requirement is balanced to the need to protect against overcrowding ballots, confusing voters, and the rise of frivolous candidates. Dr. Kelly's analysis shows that lowering the requirement to 5,000 *could lead* to nine or more candidates vying for statewide offices. . . Mr. Albright, in turn, has stated that collecting 30,000 is 'most certainly' *possible* for an independent candidate, when accompanied by appropriate planning and support.

[ECF No. 28, PageID.346 (emphasis added; internal citations omitted)]. The State does not address whether the signature requirement is narrowly tailored at all in its reply brief or its response to Plaintiffs' motion.

Neither of the expert conclusions that the State relies upon comes close to establishing that Michigan's 30,000 signature requirement is necessary or narrowly drawn to protect state interests. Plaintiffs demonstrate the deficiencies in the expert conclusions relied upon by the State:

Dr. Kelly's analysis, hypothetically projecting what 'could' be the effect of a 5,000 Signature Requirement, does not provide **any** information as to whether the current 30,000 Signature Requirement is either necessary or narrowly tailored to advance a precise interest of compelling importance. Dr. Kelly does not address the constitutionality of the current Michigan laws at all. She simply argues with Mr. Winger about the remedy that Plaintiffs have requested pursuant to 28 U.S.C. 2202.

Nor does Mr. Albright's opinion that it is 'certainly possible' for an independent candidate to collect 30,000 valid signatures . . . tell us anything about the constitutionality of the current Michigan laws. The test is not whether it is theoretically possible for a candidate to collect enough signatures. The test is whether the requirement is 'necessary' and 'narrowly tailored.'

[ECF No. 33, PageID.633-34].

The State fails to address the relevant question: whether 30,000 signatures actually is necessary and narrowly tailored. At most, Dr. Kelly's conclusion shows that 5,000 signatures *could* lead to nine candidates on the ballot for statewide office; it establishes nothing about the current challenged 30,000 requirement. And, as Plaintiffs say, the fact that it is possible for an independent candidate to collect enough signatures does not show that the 30,000 signature requirement is necessary and narrowly tailored to protect the State's interests.

On the other hand, Plaintiffs affirmatively establish that Michigan's 30,000 signature requirement is not narrowly drawn to advance a compelling state interest. First, Plaintiffs show that the 30,000 signature

requirement is an arbitrary number. This is evident by looking at Mich. Comp. Laws § 168.544f, which sets forth the minimum number of signatures required for a qualifying petition "based upon the population of the district involved." Under that statute, the State imposes a 30,000 signature requirement for districts with a population over 5 million; however, it only imposes a signature requirement of 12,000 for districts with populations up to 4,999,999. *Id.*

The State fails to explain how 12,000 signatures adequately protects its interests – i.e., ensuring a significant modicum of support and avoiding voter confusion and overcrowded ballots – in a district with up to 4,999,999 people, but to adequately protect those same interests in a district with a population of 5 million requires 30,000 signatures.

If demonstration of a "modicum of support" is the driver for the number of signatures that must be obtained, what is the State's rationale for requiring 18,000 more signatures on a qualifying petition with a population difference of one person?

The United States Supreme Court addressed such a discrepancy in *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979). There, the Court considered an equal protection challenge to the Illinois Election Code, which required new political parties and independent

candidates to obtain the signatures of 25,000 qualified voters in order to appear on a ballot for statewide elections, but applied a different – and higher – standard in elections for offices in political subdivisions of the state. *Id.* at 175-76.

The scheme required potential candidates for office in the City of Chicago to collect more than 25,000 signatures. *Id.* The Court held the discrepancy rendered the Illinois Election Code unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 186-87.

The Court recognized that the size of the pool from which signatures are requested could have significance in explaining the different standards, but also said that "even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Id.* at 185 (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58-59 (1973)). The Supreme Court held that discrepancies tied solely to a population standard and "historical accident," without more, "cannot constitute a compelling state interest." *Id.* at 187.

Moreover, Plaintiffs demonstrate that other states have lower signature requirements but do not approach the nine-candidate threshold, which the parties utilize as the threshold for voter confusion. *See Williams*, 393 U.S at 47 (Harlan, J., concurring) ("[T]he presence of eight candidacies

43

cannot be said, in light of experience, to carry a significant danger of voter confusion.").  Indeed, Mr. Winger compiled historical data showing that "no state that required more than 5,000 signatures has ever had more than eight candidates on the general election ballot for statewide office."  [ECF No. 30-3, PageID.517].

Finally, the State fails to present any evidence that would allow the Court to conclude that it actually faces a danger of voter confusion or ballot overcrowding – either at the statewide office level or any other district level, including in those districts with populations up to 4,999,999 which require only 12,000 signatures.

Based on the foregoing evidence, it is clear that the State's 30,000 signature requirement is not narrowly drawn to advance its interests.

Accordingly, Plaintiffs are entitled to summary judgment on their claims that Michigan's ballot access requirements for independent candidates for statewide office are, in combination, unconstitutional as applied to them.

## VI.    CONCLUSION

Based on the foregoing, the Court: (1) **DENIES** Defendants' Motion for Summary Judgment [ECF No. 28]; (2) **GRANTS** Plaintiffs' Motion for Summary Judgment and Permanent Injunctive Relief [ECF No. 30]; and (3)

**DECLARES** that Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) are unconstitutional as applied in combination against independent candidates for statewide office.

## VII. REMEDY

The Court **PERMANENTLY ENJOINS** the State from enforcing Mich. Comp. Laws §§ 168.590c(2), 168.544f, and 168.590b(4) in combination against independent candidates for statewide office.

The State says that "if the Court concludes that a permanent injunction is somehow warranted here, it should leave drafting a new signature requirement for independent candidates to the Michigan Legislature." The Court agrees that the responsibility to craft a new ballot access scheme for independent candidates for statewide office ultimately lies with the Michigan Legislature. And, it is free to do so at any juncture.

However, because 2020 is an election year and upon us, the Court feels compelled to make sure a procedure is in place now for independent candidates for statewide office to access the ballot. This will protect not only the rights of prospective independent candidates and those who wish to vote for them, but also the State itself and its citizens and voters. Indeed, having some ballot access requirements for independent statewide candidates – even if temporary – is better than the alternative of none.

As a Court of equity, it is within this Court's powers to fashion a remedy. *See Green Party of Georgia*, 171 F. Supp. 3d at 1372. Although the focus of this challenge concerned the combined effect of the filing deadline and the signature requirement, the Court finds that "the best way to address [the statutory scheme's] infirmity is by a reduction in the number of signatures required." *Id.* at 1373.

Accordingly, as an interim measure, the Court **ORDERS**:

     1.    An independent candidate for statewide office may qualify for the ballot by submitting a qualifying petition pursuant to the same scheme challenged by Plaintiffs, except that the petition must be signed by 12,000 qualified and registered electors instead of 30,000. The same filing deadline applies, as does the geographic distribution requirement.

     2.    This interim requirement **EXPIRES** when the Michigan Legislature enacts a permanent measure replacing the invalidated scheme for independent candidates for statewide office.

In crafting this remedy, the Court attempts to balance the parties' concerns and protect their interests. Specifically, the Court must ensure that the measure is both constitutional, and that it sufficiently protects the State's compelling interests. This remedy accomplishes each of these objectives.

Although Plaintiffs wanted the Court to require 5,000 signatures, the State expressed concerns – and submitted some evidence – that 5,000 signatures may not adequately protect the important state interests

46

discussed above.  However, considering that 12,000 signatures adequately protects the State's interests in districts with populations up to 4,999,999, *see* Mich. Comp. Laws. § 168.544f, there is no reason why this number of signatures will not adequately protect the State's interests here.  This is further supported when considering the historical data compiled by Mr. Winger, *see supra*.

On the other hand, this temporary measure is constitutional.  As opposed to the scheme declared unconstitutional – under which no candidate for statewide office had qualified for the ballot, excluding Ralph Nadar and Ross Perot for President – Graveline satisfied these interim requirements.

**IT IS ORDERED**.

s/ Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: December 22, 2019